## S02A1903. HECKMAN v. THE STATE.
### (576 SE2d 834)

HINES, Justice.

Edward William Heckman was found guilty, but mentally ill, of malice murder and concealing a death in connection with the fatal shooting of his wife, Janet Heckman. He appeals his convictions, challenging the admission of certain evidence including his post-arrest statements, the failure to give a jury charge on voluntary manslaughter, and the sufficiency of the evidence of guilt. Finding the challenges to be without merit, we affirm.[1]

On July 26, 2000, Heckman fatally shot Janet, his wife of 37 years, and buried her in a well located in their yard. After not hearing from Janet for several days, members of her family reported her missing. In the early morning hours of July 31, 2000, Clayton County police officers Palmer and Shockey went to the Heckman home to investigate Janet's whereabouts. Heckman invited the officers inside; the house appeared to be completely dark and Heckman was carrying a flashlight. When asked where Janet was, Heckman told the officers that she had gone to visit family in Chicago and that he had dropped her off at the airport between 10:00 a.m. and 11:00 a.m. on July 27; he did not have any of the flight information. The officers told Heckman that the family had called because Janet had not made it to Chicago. They asked Heckman if they could check the house to see if Janet was there and Heckman agreed. Heckman would not look

---

[1] Janet Heckman was killed on July 26, 2000. On January 10, 2001, a Clayton County grand jury indicted Heckman for malice murder, felony murder while in the commission of aggravated assault, possession of a firearm during the commission of a crime, and concealing a death. A jury trial was held March 4-6, 2002, but after the close of evidence, Heckman elected to submit the case to the court without the intervention of the jury. The State agreed to the entry of an order of nolle prosequi on the felony murder and weapon possession charges. Heckman was found guilty of malice murder and concealing a death and was sentenced to life imprisonment and a concurrent ten years incarceration. Heckman filed a motion for new trial on March 22, 2002; it was amended on July 8, 2002, and denied on July 19, 2002. He filed a notice of appeal on August 14, 2002, and the appeal was docketed in this Court on August 27, 2002. The case was submitted for decision on October 21, 2002.

one of the officers in the eye and barely acknowledged his presence; he seemed very sad and downcast, like "something was troubling" him. Heckman declined to report his wife as missing.

Later that day, Clayton County detectives Murphy and Blissitt went to the Heckman residence and Heckman invited them in. Heckman repeated his story about driving his wife to the airport, although this time he stated that he had dropped her off at 8:00 a.m. He began talking about his wife's lack of sex drive and commented to the detectives, "I know what you're looking for. You probably think I bumped her off because she wouldn't have sex with me."

The next day, Murphy and Blissitt returned to Heckman's home, accompanied by Detective Sperrazza and Police Sergeant Holloway. Heckman agreed to a search of the home, both verbally and in writing. Blissitt was standing in the living room when he noticed a notebook lying on the couch; several pages had been pulled out and were spread upon the couch. As Murphy walked over to look at the notebook, Heckman began to gather up the loose papers. Murphy asked Heckman what was in the notebook, and Heckman replied that he was just writing down some of his thoughts. Murphy asked if he could read what was in the notebook, and Heckman handed the notebook to him. On the bottom of one page Heckman had written, "My wife, I can't believe I killed her." Murphy asked Heckman about the writing, and Heckman responded, "I guess it's what I did." Heckman then offered to show where his wife was buried in the yard. He led the detectives to a well dug in the yard, and explained that he had put the body in the well, and then covered the well with yard debris.

Heckman was placed under arrest and taken to the police station. Sperrazza went to obtain a search warrant, while Holloway stayed at the house. Heckman executed a waiver of his *Miranda* rights. Murphy and Blissitt videotaped Heckman's statement. Heckman admitted that he had shot his wife after he attempted to initiate sex with her and she rebuffed him. They argued and he retrieved the rifle from underneath his side of the bed and shot her once in the chest and once in the head as she was lying in bed. Heckman wrapped the body in bed linen, dragged it from the room and out of the basement, put it in the well, and covered up the site. He then attempted to clean up evidence of the crime. After police determined that the audio portion of the videotape was defective, Heckman was again given *Miranda* warnings, executed another waiver, and agreed to an audiotaped interview, in which he again described the circumstances of the shooting and the disposal of his wife's body.

Luminol testing of the Heckman residence revealed significant blood spatter in the master bedroom. Examination of Janet Heck-

man's body disclosed that she had sustained gunshot wounds to the right upper chest and to the head. Each wound, in and of itself, would have been fatal.

1. Heckman contends that it was error to admit into evidence his taped post-arrest statements because there was no evidence that he was initially given *Miranda*[2] warnings. He argues that although he was given his *Miranda* warnings prior to his taped confessions at the police station, he had already made incriminating statements at the house, so all the statements he made should have been suppressed, including those that occurred following the administration of *Miranda*. But the argument fails.

"*Miranda* protections adhere when an individual is (1) formally arrested or (2) restrained to the degree associated with a formal arrest. [Cits.]" *Tolliver v. State*, 273 Ga. 785, 786 (546 SE2d 525) (2001). "[W]here [an] accused [is] neither in custody nor so restrained as to equate to a formal arrest, any statements made to [an] investigating officer [are] made under noncustodial circumstances and *Miranda* warnings [are] not required." Id. at 785.

Heckman maintains that he was effectively under arrest as soon as Murphy saw the written line, "[m]y wife, I can't believe I killed her," and therefore, should have been given *Miranda* warnings at that point. But the trial court found otherwise, and there is evidence to support the trial court's finding that the written statement was discovered during the course of the investigation prior to arrest. See *Moses v. State*, 264 Ga. 313, 314 (1) (444 SE2d 767) (1994). At the hearing on the motion to suppress, Detective Murphy testified that after reading the suspicious statement, Murphy considered Heckman to be subject to "an investigative detention," but that Heckman was not in custody. Murphy further testified that Heckman was cooperative during the encounter, and that he never inquired about whether he could leave or gave any indication that he wanted to leave the residence. Nor did the police indicate to Heckman that he was restrained from leaving. The mere fact that someone is the prime suspect "does not mandate *Miranda* warnings unless a reasonable person in the suspect's position would have ' "understood the situation to constitute restraint on freedom of movement of the degree which the law associates with (a) formal arrest." (Cit.)' [Cit.]" *Tolliver v. State,* supra at 786.[3]

Assuming arguendo that Heckman was under arrest at the time the police saw the notebook writing, there is no reason to suppress

---

[2] *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966).

[3] At the suppression hearing, Heckman initially testified that he felt free to leave the company of the officers after the statement in the notebook was discovered, but he indicated otherwise after further questioning by his attorney.

the later taped statements on the basis that they were "tainted" by the earlier failure of the police to provide *Miranda* warnings. Certainly, in the situation in which law enforcement officers conduct a custodial interrogation of a suspect without the benefit of *Miranda* warnings, the suspect's answers are presumed to be compelled, and therefore, will be suppressed. *Livingston v. State*, 264 Ga. 402, 407 (6) (444 SE2d 748) (1994).

> However, where the suspect is later given *Miranda* warnings, the admissibility of any subsequent statement turns on whether, under all the circumstances, that statement was knowingly and voluntarily made. *Oregon v. Elstad*, 470 U. S. 298, 309 (105 SC 1285, 84 LE2d 222) (1985). Further if the suspect made the initial statement voluntarily, the fact that it was not preceded by *Miranda* warnings will not taint a subsequent voluntary statement which had the benefit of those warnings. [Cit.]

*Livingston v. State,* supra at 408 (6). Here, the evidence supports the findings that both Heckman's pre-*Miranda* and post-*Miranda* statements were voluntarily made. Accordingly, there was no error in admitting the taped statements into evidence.

2. Heckman next contends that the trial court erred in allowing the contents of the notebook to go to the jury because they were discovered during an unlawful search of his home. Heckman urges that because he was mentally ill he was incapable of consenting to the search; he further maintains that he was coerced into allowing the search by threats to obtain a search warrant, and that he revoked any consent to search when he gathered up his notebook papers prior to the police discovering the incriminating contents of the notebook and his subsequent admission of guilt. Additionally, he asserts that the notebook contents were not subject to seizure because they were "private papers" under OCGA § 17-5-21, and that the search warrant and its execution left too much to the discretion of the officers.

Initially, it must be noted that any alleged error in the admission of evidence before the jury is of no moment inasmuch as the case was removed from the jury's consideration, and the trial court, rather than the jury, determined Heckman's guilt.[4] As for any complaint about the trial court's consideration of evidence of the notebook contents, it fails on the merits.

A determination of mental illness is not tantamount to a finding

---

[4] There is no contention, much less a showing, that Heckman chose a bench determination of guilt or innocence because of the admission of the notebook or any other specific piece of evidence.

of mental incompetency. See *Morrow v. State*, 266 Ga. 3 (463 SE2d 472) (1995). Moreover, the evidence of record does not support the assertion that Heckman was not competent to consent to a search of his home. Quite the contrary. The evidence of Heckman's interactions with the police on the three separate occasions they came to his home supports the conclusions that Heckman understood the nature and purpose of the police presence and that he knowingly consented to the search at issue.

As to the voluntariness of the consent to search, it is determined from consideration of all of the surrounding circumstances. *Thomason v. State*, 268 Ga. 298, 302 (2) (b) (486 SE2d 861) (1997). In this case, the evidence supports the finding that the consent to search on August 1, 2000, was not the result of police coercion, duress or other impermissible factor.[5] Id.

Detective Murphy testified that when the police arrived at the Heckman residence on August 1, 2000, he knocked on the door, and Heckman answered; Murphy asked Heckman how he was doing and if he had heard from his wife; Heckman responded that he had not heard from his wife; Murphy explained that he was there to request permission to come into the house and look for signs that Janet had been harmed or hurt inside the house; Murphy explained to Heckman that he did not have to consent to the search, and did not have to allow anyone in; Heckman responded, "[S]ure, come on in"; the detective and the other officers entered; Murphy asked Heckman to read a written consent to search form; Heckman retrieved his reading glasses; Murphy held the form in front of Heckman so that he could read it and Murphy began reading the contents to Heckman; Heckman read the last two paragraphs himself; Murphy asked about Heckman's education and Heckman responded that he had a "GED"; Murphy asked Heckman if he understood what was going on, and Heckman indicated that he did; Heckman signed the consent form and the search began.

Moreover, Heckman's claim that he rescinded any consent to search by gathering up the notebook papers does not aid him. The evidence is that following such action, Heckman voluntarily handed over the notebook for the police to review.

---

[5] Insofar as Heckman claims that the consent to search on August 1, 2000, was rendered involuntary because of an exchange between Heckman and Officers Palmer and Shockey the day before, this claim too is unavailing. The evidence is that as Officer Shockey began to check the house to verify that Janet was not there, Heckman asked Officer Palmer, "Do you have to have a warrant to search here[?]" Palmer yelled for Shockey to stop, and responded to Heckman that if he did not want to give permission to search, if the police wanted to pursue the search they would need a warrant. Palmer asked Heckman if he wanted them to then search. Heckman "was very friendly about it," told Palmer that he "was just curious," and then stated that the officers could search the premises.

As to Heckman's assertion that the notebook pages were "private papers" exempt from seizure under OCGA § 17-5-21, this Court has interpreted the statute as being restricted to papers covered by privilege. *Sears v. State*, 262 Ga. 805, 807 (3) (426 SE2d 553) (1993).

Finally, Heckman's complaint that the search warrant and its execution left too much to the discretion of the officers is unavailing. The search in which the notebook was found was not conducted pursuant to a warrant but was the result of Heckman's consent.

3. Heckman contends that the trial court committed reversible error by not agreeing to give a jury charge on voluntary manslaughter where there was evidence to show that immediately before he shot his wife, he was "provoked by the victim refusing to have sex with him, and threatening to take the house," and that the refusal to give the requested charge ultimately led to Heckman's acceptance of a bench determination rather than a verdict from the jury.[6] However, there was no evidence of provocation to authorize an instruction on voluntary manslaughter. *Johnson v. State*, 275 Ga. 630, 631 (4) (570 SE2d 309) (2002). Compare *Brooks v. State*, 249 Ga. 583 (292 SE2d 694) (1982). Even so, the trial court stated that it would consider voluntary manslaughter in reaching its bench decision.

4. There is no merit to Heckman's contention that the determinations of guilt were contrary to the evidence and without evidence to support them. The evidence was sufficient to enable a rational trier of fact to find Heckman guilty beyond a reasonable doubt of the crimes of which he was convicted. *Jackson v. Virginia*, 433 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

*Judgments affirmed. All the Justices concur.*

DECIDED JANUARY 27, 2003.

*Elaine T. McGruder*, for appellant.
*Robert E. Keller*, District Attorney, *Adrian Britt*, Assistant District Attorney, *Thurbert E. Baker*, Attorney General, *Jennifer S. Gill*, Assistant Attorney General, for appellee.

---

[6] Heckman does not challenge the waiver of his right to trial by jury, and the record supports a finding that such waiver was knowing and voluntary.