S11A1014. BOWLING v. THE STATE.
(717 SE2d 190)

HUNSTEIN, Chief Justice.

Following a trial, a jury convicted appellant Larry Bowling of felony murder and aggravated assault in connection with the shooting death of Melody Harrell. Bowling appeals from the denial of his motion for new trial,[1] arguing that a search warrant for his medical records and the introduction of the records into evidence violated his constitutional rights; the trial court erred in admitting his custodial statements; and his trial counsel was ineffective. We affirm.

1. The evidence at trial authorized the jury to find that on the evening of April 23, 2004, Bowling, victim Harrell, and several of Bowling's family members went to a bar in Buford, the Hideaway, to celebrate Bowling's birthday. Bowling drank shots of liquor and began to disturb other customers. Around midnight, police responded to a call from the Hideaway. Personnel from the bar reported that Bowling had struck Harrell and needed to leave.

---

[1] The crimes occurred on April 24, 2004, and a Gwinnett County grand jury returned a true bill of indictment against Bowling on July 21, 2004, charging him with malice murder, felony murder, and aggravated assault. By notice of appeal filed October 8, 2008, Bowling appealed to this Court from the trial court's order denying his second motion to dismiss based on violation of his state and federal constitutional right to a speedy trial. This Court affirmed. *Bowling v. State*, 285 Ga. 43 (673 SE2d 194) (2009). Bowling was tried before a jury on May 18-22 and May 26, 2009. The jury returned its verdict on May 26, 2009, convicting Bowling of felony murder and aggravated assault and acquitting him of malice murder. The trial court merged the aggravated assault conviction into the felony murder conviction and sentenced Bowling to life in prison for felony murder. Bowling's motion for new trial, filed May 27, 2009 and amended August 27, 2010, was denied October 1, 2010. The appeal was docketed to the April 2011 term in this Court and orally argued on June 13, 2011.

Bowling was in the parking lot when police arrived. He refused to leave at first but ultimately departed in a van driven by Harrell.

At approximately 2:42 a.m. on April 24, 2004, Gwinnett County police officer Miles Shapiro responded to a reported traffic accident in the Bona Road area. Upon arriving, Shapiro observed a van that had crashed into the right front corner of a house at 615 Bona Road and saw Bowling standing over Harrell, who was lying in the driveway with a large amount of blood around her head. Shapiro asked Bowling what happened, and Bowling replied that he accidentally shot Harrell when a gun discharged from his ankle and Harrell, who was driving, lost control of the van. Shapiro asked where the weapon was, but Bowling stated that he did not know. Shapiro decided to take Bowling into custody. He handcuffed Bowling's right wrist through Bowling's belt and beltloop but left the left wrist free because Bowling was complaining of a shoulder injury, and he had Bowling lie on the ground. Shapiro again asked Bowling about the location of the gun. Bowling said that he thought it was in the van.

Officer Joseph Morales subsequently arrived at the scene followed by Sergeant Scott Killian. As Morales attempted to assess Harrell's condition, Bowling told him that it was an accident and she was shot. Morales asked Bowling where the gun was, and Bowling stated that it was under his leg. When Killian arrived, Bowling was yelling that he had shot her, it was an accident, and the police needed to help her. Killian asked Bowling, "What happened?" and "Where's the gun?" Bowling replied that the gun went off accidentally and that the gun was under his left leg, but when Killian clarified that he wanted to know where it was "right now," Bowling said he did not know. As Killian examined Bowling's pant leg, Bowling told Killian that the gun was under the seat under his left leg. Shapiro ultimately located a loaded .380 caliber handgun some six to eight feet from the van's passenger door under a window of the house.

Bowling and Harrell were transported to Gwinnett Medical Center, where Harrell died from a gunshot wound to her head shortly after midnight on April 25, 2004. At the hospital, Bowling asked Shapiro to come into the room where he was being treated. Bowling told the doctor that he was in the car with his girlfriend while she was driving and a gun accidentally went off. As part of his treatment, Bowling's blood and urine were drawn and analyzed. The lab results showed his blood alcohol content was .142; his urine drug screen was positive for cocaine, marijuana, opiates, and benzodiazepines.

Investigator Dave Henry introduced himself to Bowling at the hospital and asked Bowling his name and the victim's name, which Bowling provided. Without prompting, Bowling stated that the weapon was under his leg, he pulled it out, and when it was raised to head level, it accidentally went off. After checking on Harrell, Henry

advised Bowling that he was under arrest and secured an arrest warrant. Officer Larry Stone relieved Shapiro at around 7:00 a.m. As Stone stood outside the treatment room, Bowling said that "he loved her, it was an accident and that he would never hurt her." Bowling asked Stone to come into the room, where Bowling stated that he pulled the gun from under the passenger seat and when he had it up, it just discharged. While en route to jail, Bowling asked Stone whether he had ever had a gun "just go off."

Kelley Cross, who lived with Bowling in August 2008 when Bowling was out on bond, testified that Bowling told him that, on the date in question, he sent Harrell to Bona Road to buy cocaine, but the substance she purchased was not cocaine, so he had Harrell drive him back to Bona Road. According to Cross, Bowling said that when they found the seller, he brandished his gun and demanded his money or the drugs and "[Harrell] . . . started freaking out . . . so he turned the gun on her and told her to quit tripping and she knocked his arm back. And right when she knocked his arm back, that's when he . . . shot her."

Viewed in the light most favorable to the verdict, the evidence was sufficient to enable the jury to find beyond a reasonable doubt that Bowling was guilty of the crimes of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. On May 13, 2009, an investigator with the district attorney's office obtained and executed a search warrant authorizing a search of Gwinnett Medical Center for records regarding the examination, treatment, and care of Bowling on April 24, 2004. Bowling contends that the search warrant was unconstitutional and the medical records should have been suppressed at trial.

(a) Bowling maintains that the privacy guarantees inherent in the Fourth Amendment to the U. S. Constitution and Art. I, Sec. I, Par. XIII of the Georgia Constitution prohibited the search and seizure of his personal medical records, even pursuant to a valid search warrant. We disagree.

We do not dispute that both the Fourth Amendment and the corresponding provision of the Georgia Constitution protect personal privacy. See, e.g., *City of Ontario, Cal. v. Quon*, ___ U. S. ___ (130 SC 2619 (II), 177 LE2d 216) (2010); *King v. State*, 272 Ga. 788 (1) (535 SE2d 492) (2000) ("*King I*"). Indeed, an individual may challenge the legality of a search under the Fourth Amendment or Ga. Const., Art. I, Sec. I, Par. XIII only if he or she has "manifested a subjective expectation of privacy in the object of the challenged search and society is willing to recognize that expectation as reasonable. [Cit.]" (Punctuation omitted.) *Kyllo v. United States*, 533 U. S. 27, 33 (II) (121 SC 2038, 150 LE2d 94) (2001). See also *Espinoza v. State*, 265 Ga. 171 (2) (454 SE2d 765) (1995); *Thomas v. State*, 263 Ga. 85 (3)

(428 SE2d 564) (1993).

Even assuming for purposes of this opinion that patients generally maintain a reasonable expectation of privacy in their medical records for purposes of the Fourth Amendment and Ga. Const., Art. I, Sec. I, Par. XIII, Bowling's attempt to establish a reasonable expectation of privacy in his medical records under the particular circumstances of this case founders by virtue of the fact that he invited two law enforcement officers into the room where he was being treated. Bowling cannot claim an expectation of privacy in the medical records to the extent that they contain information he disclosed to medical personnel or they disclosed to him in those two officers' presence. See *Thomas*, supra, 263 Ga. at 87 ("What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection. [Cit.]").

Even if we further assume that, despite inviting the officers into his room, Bowling nonetheless maintained a reasonable expectation of privacy in some portion of the medical records, the search and seizure of those records pursuant to a valid warrant was lawful. The privacy protections afforded by the Fourth Amendment are not absolute. Rather, "the permissibility of a particular practice 'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.' [Cits.]" *Cooper v. State*, 277 Ga. 282, 286 (587 SE2d 605) (2003). In rejecting an appellant's argument that his state constitutional due process rights entitled him to notice and opportunity to be heard prior to issuance of a search warrant for his medical records, we explained:

> When the State's reason to believe incriminating evidence will be found becomes sufficiently great, the invasion of privacy becomes justified and a warrant . . . will issue. . . . [T]he Fourth Amendment has itself struck the balance between privacy and public need, and there is no occasion or justification for a court to revise the Amendment and strike a new balance.

(Punctuation and footnotes omitted.) *King v. State*, 276 Ga. 126, 128-129 (2) (577 SE2d 764) (2003) ("*King II*"). Although Bowling is not asserting a due process violation, these statements apply with even greater force to defeat the violations of the Fourth Amendment and Georgia Constitution alleged here.

Seeking to persuade us that disclosure of personal medical records pursuant to a search warrant is contrary to contemporary standards of privacy, Bowling cites a number of federal and state statutes. Although Bowling refers generally to the Health Insurance

Portability and Accountability Act of 1996 ("HIPAA") and the HIPAA Privacy Rule, 45 CFR §§ 160, 164, he fails to acknowledge that the Privacy Rule authorizes disclosure of protected health information without notice, consent, or opportunity to object "[i]n compliance with and as limited by the relevant requirements of: (A) A . . . court-ordered warrant." 45 CFR § 164.512 (f) (1) (ii) (A).[2] Bowling also suggests that 42 USC § 290dd-2 and its implementing regulations establish a standard for law enforcement to obtain private medical records. In fact, 42 USC § 290dd-2 designates as confidential and limits disclosure only of records:

> of the identity, diagnosis, prognosis, or treatment of any patient which are maintained in connection with the performance of any program or activity relating to substance abuse education, prevention, training, treatment, rehabilitation, or research, which is conducted, regulated, or directly or indirectly assisted by any department or agency of the United States.

42 USC § 290dd-2 (a). Even assuming the applicability of 42 USC § 290dd-2 and regulations promulgated thereunder, which Bowling does not attempt to establish,[3] a court is authorized to order disclosure of confidential communications on the ground that "[t]he disclosure is necessary in connection with investigation or prosecution of an extremely serious crime . . . including homicide." 42 CFR § 2.63 (a) (2).

Bowling's reliance on Georgia statutes is equally unavailing. While OCGA § 24-9-40 (a) establishes the confidentiality of medical information concerning a patient, it also authorizes release of information "on appropriate court order." The other statutes upon which Bowling relies are inapplicable and, in any event, permit disclosure of confidential records under a host of circumstances, including under a court order. See OCGA §§ 24-9-47, 37-3-166, 37-7-166.

Finally, Bowling asserts that his medical records enjoy immunity

---

[2] See also Standards for Privacy of Individually Identifiable Health Information, 65 Fed. Reg. 82462, 82464 (Dec. 28, 2000) ("Individuals' right to privacy in information about themselves is not absolute. It does not, for instance, prevent reporting of public health information . . . or stop law enforcement from getting information when due process has been observed.")

[3] An emergency room qualifies as a "program" only if it "holds itself out as providing, and provides, alcohol or drug abuse diagnosis, treatment or referral for treatment" or the "primary function" of emergency room personnel "is the provision of alcohol or drug abuse diagnosis, treatment or referral for treatment and [they] are identified as such providers." 42 CFR § 2.11. See also 42 CFR § 2.12 (e) (1).

from disclosure under *Warden v. Hayden*, 387 U. S. 294 (87 SC 1642, 18 LE2d 782) (1967). As we explained in *Brogdon v. State*, 287 Ga. 528, 532-533 (2), n. 7 (697 SE2d 211) (2010), in *Hayden*, the United States Supreme Court repudiated the "mere evidence" rule, under which items of evidential value only could not be the subject of a search warrant, but left open the possibility that an individual's private papers might have protection under the Fifth Amendment. Since *Hayden*, the Supreme Court has continued to put distance between itself and the broad language used in one of its prior opinions, *Boyd v. United States*, 116 U. S. 616 (6 SC 524, 29 LE 746) (1886), regarding the Fifth Amendment protection afforded to the contents of private documents. See *Brogdon*, supra, 287 Ga. at 533, n. 7. We need not decide in this case whether the concept that the Fifth Amendment shields the contents of private papers has any remaining viability since the medical records at issue, which were neither owned nor possessed by Bowling, are not Bowling's private papers. See id. at 533-534 (2) (term "private papers" in OCGA § 17-5-21 (a) (4) did not include a defendant's medical records; they were not "private papers" as term was understood in 1966 when statute was enacted).

(b) Bowling further argues that his medical records should receive Fifth Amendment protection since they reflect information he was "compelled" to disclose to medical personnel and the results of blood and urine tests to which he was "compelled" to consent to obtain appropriate medical treatment.

As an initial matter, the Fifth Amendment privilege against self-incrimination "protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature." (Footnote omitted.) *Schmerber v. California*, 384 U. S. 757, 761 (II) (86 SC 1826, 16 LE2d 908) (1966). Since neither the taking nor the chemical analysis of Bowling's blood and urine compelled him to provide testimony or evidence of a communicative nature, the results of the analyses performed on his blood and urine are not within the scope of the Self-Incrimination Clause of the Fifth Amendment. See id. at 765 (II).[4]

Further, "coercive police activity is a necessary predicate to the finding that a statement is not voluntary." (Citation and punctuation

---

[4] Bowling argues that the privilege against self-incrimination sweeps more broadly under Georgia law. While Art. I, Sec. I, Par. XVI of the Georgia Constitution and OCGA § 24-9-20 (a) apply to oral or real evidence as opposed to testimony alone, see *Creamer v. State*, 229 Ga. 511, 516 (192 SE2d 350) (1972), this Court has held that "[t]he removal of a substance from the body through a minor intrusion does not cause the person to be a witness against himself within the meaning of Fifth Amendment protection and similar provisions of Georgia law." *Strong v. State*, 231 Ga. 514, 519 (202 SE2d 428) (1973). See also *Fortune v. State*, 300 Ga. App. 550 (2) (b) (685 SE2d 466) (2009).

omitted.) *United States v. Romero*, 897 F2d 47, 52 (II) (B) (1) (2d Cir. 1990) (defendant's statement to nurse in emergency room was voluntary absent evidence of police coercion). Because Bowling does not assert that he divulged information to medical personnel or consented to tests as a result of coercive police activity, he has no basis for asserting a violation of his Fifth Amendment privilege against self-incrimination.

(c) Finally, Bowling maintains that the search warrant was overbroad. The search warrant was no broader than the one we approved in *King II*, supra, 276 Ga. at 129. There, as here, the warrant was "narrowly drafted . . . to seek only the medical records related to the . . . treatment of [appellant] on the night of [the crimes]." Id. Contary to Bowling's arguments, his medical records were relevant and admissible. Evidence of Bowling's drug and alcohol use around the time of the shooting was admissible as part of the res gestae and relevant to Bowling's state of mind at the time of the crimes. See *Johnson v. State*, 264 Ga. 456 (3) (448 SE2d 177) (1994).[5]

3. Bowling contends that use of his medical records at trial violated his rights under the Confrontation Clause of the Sixth Amendment.

The admission of out-of-court statements that are testimonial in nature violates the Confrontation Clause unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U. S. 36, 68 (124 SC 1354, 158 LE2d 177) (2004). An out-of-court statement is not testimonial, however, unless "procured with a primary purpose of creating an out-of-court substitute for trial testimony." *Michigan v. Bryant*, ___ U. S. ___ (131 SC 1143, 1155 (II), 179 LE2d 93) (2011).

Admitting Bowling's medical records into evidence at trial did not violate the Confrontation Clause. The emergency room physician primarily responsible for Bowling's care testified at trial. Since she was subject to cross-examination, the Supreme Court's decisions in *Crawford* and its progeny have no application to her own statements in the report she prepared after meeting with Bowling. See *McKnight v. State*, 283 Ga. 56 (2) (i) (656 SE2d 830) (2008). In any event, none of the medical records are testimonial inasmuch as the circumstances surrounding their creation and the statements and actions of the parties objectively indicate that the records were prepared with a primary purpose of facilitating Bowling's medical care. See *Bryant*,

---

[5] Bowling also contends that his trial counsel was ineffective to the extent that he failed to adequately preserve an objection to the records' relevancy. His trial counsel could not have been ineffective, however, for failing to make or preserve a meritless objection. See *Wesley v. State*, 286 Ga. 355 (3) (a) (689 SE2d 280) (2010).

131 SC at 1156 (III). The records were created by medical personnel in connection with treatment rendered to Bowling in an emergency situation and are devoted to documenting and assessing Bowling's medical history and condition and describing his treatment. As to the drug and urine screens, Bowling's physician testified that she ordered the tests for medical purposes. Medical records created for treatment purposes are not testimonial. See *Melendez-Diaz v. Massachusetts*, 557 U. S. 305 (129 SC 2527, 2533 n. 2, 2542, 174 LE2d 314) (2009) (holding that affidavits of state laboratory analysts reporting results of chemical analysis of seized substance were testimonial but stating that "medical reports created for treatment purposes . . . would not be testimonial under our decision today"); *Massachusetts v. Dyer*, 934 NE2d 293, 298 (Mass. Ct. App. 2010) (admission of medical records revealing defendant's blood alcohol level did not violate Confrontation Clause).

4. Bowling argues that the trial court erred in denying his motion to suppress statements he made at the crime scene and the hospital prior to receiving *Miranda* warnings.

(a) *Crime Scene.* The first officer on the scene, Shapiro, testified at the *Jackson-Denno* hearing that he believed that he was merely investigating a traffic accident and did not know what had happened. It was only after Bowling, in response to Shapiro's initial inquiries, stated that he had accidentally shot Harrell and did not know where the weapon was that Shapiro took Bowling into custody. "Where an accused is neither in custody nor so restrained as to equate to a formal arrest, any statements made to an investigating officer are made under noncustodial circumstances and *Miranda* warnings are not required. [Cit.]" (Punctuation omitted.) *Heckman v. State*, 276 Ga. 141, 143 (1) (576 SE2d 834) (2003). Since Bowling was not in custody at the time of Shapiro's initial inquiries, Bowling's responses to those inquiries were admissible. See generally *Gabriel v. State*, 280 Ga. 237 (2) (626 SE2d 491) (2006).

After taking Bowling into custody, Shapiro again asked Bowling where the weapon was. In *New York v. Quarles*, 467 U. S. 649, 656 (104 SC 2626, 81 LE2d 550) (1984), the United States Supreme Court recognized an exception to the requirement that *Miranda* warnings be given that applies in situations in which "police officers ask questions reasonably prompted by a concern for public safety." See also *Smith v. State*, 264 Ga. 857 (3) (452 SE2d 494) (1995). Like the officers in *Quarles*, Shapiro was confronted with an immediate need to locate a gun that the suspect recently possessed, likely was discarded nearby, and "posed more than one danger to the public safety." *Quarles*, supra, 467 U. S. at 657. Accordingly, Shapiro's inquiry about the location of the gun was justified.

Within approximately 15 minutes of Shapiro's arrival, Morales

arrived on the scene, followed by Killian. Upon the arrival of each officer, Bowling made unsolicited statements regarding what happened. Since "it is clear that [these] statements were spontaneous and voluntary and were not made in response to custodial interrogation or its functional equivalent [cit.]," (citation and punctuation omitted), they were properly admitted into evidence. *Hatcher v. State*, 286 Ga. 491, 493-494 (3) (690 SE2d 174) (2010). Like Shapiro, both Morales and Killian asked Bowling about the location of the weapon. Given that the gun was still missing, the scene was not yet secure, and Bowling's statements as to the location of the gun were confusing and inconsistent, these inquiries fell within the scope of the public safety exception.

Killian also asked Bowling what happened, prompting Bowling to respond that the gun went off accidentally. This inquiry did not fall within the public safety exception. When Killian arrived, the other officers already understood the general nature of the situation, and as soon as Killian arrived, he heard Bowling yelling that he had shot Harrell and that it was an accident. Under the circumstances, the existing exigency facing officers was locating the gun, and Killian's broader inquiry about what happened was not focused on this issue. Compare *Quarles*, supra, 467 U. S. at 659 (officer "asked only the question necessary to locate the missing gun"). Nonetheless, the trial court's error in admitting Bowling's response to Killian's inquiry was harmless beyond a reasonable doubt, as the statement was cumulative of numerous admissible statements Bowling made. See *Frazier v. State*, 278 Ga. 297 (4) (602 SE2d 588) (2004).

(b) *Hospital*. Bowling's voluntary, unsolicited statements made to or in the presence of Henry and Stone at Gwinnett Medical Center were properly admitted into evidence. See *Hatcher*, supra, 286 Ga. at 493-494 (3).

5. Finally, Bowling contends that his trial counsel rendered ineffective assistance by failing to file an out-of-time demand for a speedy trial. To succeed on this claim, Bowling must show that his trial counsel's performance was professionally deficient and that, but for such deficient performance, a reasonable probability exists that the outcome of the trial would have been different. *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984).

At an October 24, 2006 hearing on Bowling's motion to dismiss based on violation of his right to a speedy trial, the trial court verbally denied the motion but stated that it would allow Bowling to file an out-of-time statutory demand for a speedy trial before the end of the month. At the motion for new trial hearing, Bowling's trial counsel testified that he made a strategic decision not to file a demand in light of his continuing investigation. Bowling's trial counsel (his second appointed attorney) began representing Bowling

in January 2005. The record reflects that trial counsel retained an investigator, who began looking for witnesses to corroborate the defense theory that a third person was in the van at the time of the shooting. The investigator followed several leads, but was unsuccessful until he located Delores Daniel in October 2007. Although she was subjected to vigorous cross-examination by the State, Daniel testified for the defense at trial that she resided on Bona Road on April 24, 2004 and was outside with friends in the early morning when she saw a van pass by, heard a gunshot, and discovered that the van had run into a house. She stated that she thought she saw someone jump from the van and run behind the house.

"The decision to file a speedy trial demand is usually tactical in nature." (Footnote omitted.) *Napier v. State*, 276 Ga. 769, 776 (8) (583 SE2d 825) (2003). Reasonable trial strategy and tactics do not amount to ineffective assistance of counsel. *Johnson v. State*, 286 Ga. 787 (2) (692 SE2d 575) (2010). Trial counsel's strategic decision to forego filing an out-of-time demand for speedy trial to continue to pursue his investigation was reasonable and did not constitute ineffective assistance.

*Judgment affirmed. All the Justices concur.*

DECIDED OCTOBER 17, 2011.

*Clark & Towne, David E. Clark, Jessica R. Towne*, for appellant.
*Daniel J. Porter, District Attorney, Rodney K. Miles, Assistant District Attorney, Samuel S. Olens, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Benjamin H. Pierman, Assistant Attorney General*, for appellee.