310 Ga. 624
FINAL COPY

S20G0492. NUCKLES v. THE STATE.

MCMILLIAN, Justice.

Wanda Nuckles was charged with depriving James Dempsey, an elder person, of essential services and concealing his death. Prior to her trial on those charges, Nuckles filed a motion seeking to exclude a video recording captured on a camera concealed in Dempsey's room at the residential rehabilitation center where Nuckles worked, asserting that the recording was inadmissible under OCGA § 16-11-67 because she did not consent to its recording as required under OCGA § 16-11-62 (2). The trial court denied the motion, and Nuckles appealed that ruling to the Court of Appeals, which affirmed the trial court in an unpublished opinion. *Nuckles v. State*, 352 Ga. App. XXV (Case No. A19A1578) (September 30, 2019) (unpublished). This Court granted Nuckles's petition for certiorari on the issue of whether the Court of Appeals erred in determining that the video recording at issue fell within the exception provided

in OCGA § 16-11-62 (2) (B). Because we agree that the video recording falls within that exception, we affirm.

Construed in the light most favorable to the trial court's factual findings and judgment,[1] the evidence presented at the motion to suppress hearing showed that in December 2013, following hip surgery, 89-year-old Dempsey was discharged from the hospital to the North Atlanta Rehabilitation Center (the "rehab facility"), where Nuckles was employed.[2] Although Dempsey was first placed in a room on the main floor, he was moved a day or two later to the portion of the rehab facility housing patients with dementia. Dempsey's son, Timothy, who saw his father daily, noticed that Dempsey appeared "kind of out of it" and asked that a doctor examine him. After the doctor determined that Dempsey was extremely dehydrated, Dempsey was transferred back to the hospital.

---

[1] See *Kennebrew v. State*, 304 Ga. 406, 409 (819 SE2d 37) (2018).

[2] The record contains no evidence regarding the capacity in which Nuckles was employed at the rehab facility, but Nuckles asserted in her motion to suppress that she was employed as a licensed practical nurse.

Dempsey returned to the rehab facility on February 7, 2014, and although his mind was clear, Dempsey was again placed in the area housing dementia patients because there were no other rooms available. Dempsey shared his room with a roommate, but there was a privacy curtain between the areas assigned to the two residents that was usually drawn. Timothy employed a caretaker to stay with his father during the day, and Timothy visited in the evenings. Dempsey related to Timothy that strange things were happening in his room at night. Dempsey said, for example, that one of the female residents came into his room and tried to get in bed with him, and a male resident came into his room unclothed. Dempsey's personal items also began to go missing, including his hearing aids and various toiletry items. Additionally, Dempsey complained about the care he was receiving, reporting that staff members were sometimes rude to him and that they would not answer his calls for assistance in a timely fashion. Dempsey asked Timothy to spend the night with him, but Timothy was unable to do so because he had to care for his stepchildren at night while his wife worked.

Instead, Timothy decided to install a video surveillance camera in order to see what was going on in Dempsey's room at night, and he found a camera online that was concealed in a four- to five-inch-square alarm clock and that would record "24/7" in five-minute increments onto a memory card. Timothy installed the camera on February 7 or 8, 2014, placing it on the dresser across from Dempsey's bed where it was focused on Dempsey and his belongings. It did not capture Dempsey's roommate's side of the room, and the roommate only appeared on camera when he came over to Dempsey's area. Timothy testified that Dempsey was happy with the camera because he felt like someone was watching what was going on. Only Timothy, Dempsey, the private caretaker hired by Timothy to watch his father during the day, Timothy's wife, and Timothy's stepdaughter knew the camera was there.

Dempsey passed away on February 27, 2014, and by that time, the camera had recorded approximately 400 hours of video. Before viewing the video from the night of Dempsey's death, Timothy contacted law enforcement and requested that an autopsy be

4

performed because Timothy had visited Dempsey the night before his death, thought Dempsey had been doing well, and found his death to be unexpected. Later, after Timothy viewed the video from the camera in Dempsey's room, he forwarded it to law enforcement.[3]

Nuckles was subsequently indicted by a grand jury[4] and charged with one count of depriving an elder person of essential services under OCGA § 16-5-102 and one count of concealing the death of another under OCGA § 16-10-31.[5] She later filed a "Motion

---

[3] The record does not contain a copy of the video recording or a description of what it shows, but the State asserts that the evidence is essential to its prosecution.

[4] Nuckles was indicted along with two co-defendants, Loyce Pickquet Agyeman, who was individually charged with felony murder and neglect of an elder person, and Mable L. Turman, who was individually charged with neglect of an elder person. All three defendants were indicted on the same charge of concealing the death of another.

[5] The count charging Nuckles with depriving an elder person of essential services under OCGA § 16-5-102 alleged that Nuckles deprived Dempsey of "medical services necessary to maintain [his] physical well-being . . . by failing to initiate and continue [CPR] immediately upon discovering that [he] was unresponsive." The count of concealing the death of another under OCGA § 16-10-31 alleged that the three co-defendants concealed Dempsey's death, which hindered the discovery of whether he was unlawfully killed, alleging as to Nuckles that she "replaced an oxygen canister in [Dempsey's] room which was not functioning properly" and that she and her co-defendant Agyeman "started performing two-person [CPR] approximately one hour after [Dempsey] had become unresponsive, to create the false impression that they were trying to save [Dempsey's] life."

5

to Suppress/Motion in Limine" seeking to exclude the video recording taken in Dempsey's room, asserting that, because she did not consent to the video recording, it was made in violation of OCGA § 16-11-62 (2).[6] That subsection provides that it is unlawful for

> [a]ny person, through the use of any device, without the consent of all persons observed, to observe, photograph, or record the activities of another which occur in any private place and out of public view[.]

OCGA § 16-11-62 (2). Nuckles filed her motion to suppress the video recording pursuant to OCGA § 16-11-67, which provides: "No evidence obtained in a manner which violates any of the provisions of this part shall be admissible in any court of this state except to prove violations of this part." The State argued in response, however, that the video recording was admissible because it fell within the exception set forth in OCGA § 16-11-62 (2) (B) (the "Security Exception"), which provides that it is *not* unlawful

> [f]or an owner or occupier of real property to use for security purposes, crime prevention, or crime detection any device to observe, photograph, or record the activities of persons who are on the property or an approach thereto in areas where there is no reasonable expectation of

---

[6] Nuckles's co-defendants later joined in the motion.

6

privacy[.]

The trial court denied the motion following an evidentiary hearing, ruling that the video recording did not occur in a "private place," under OCGA § 16-11-62 (2), and thus Nuckles lacked standing to contest the recording. Alternatively, the trial court found that the video recording fell within the Security Exception. The trial court concluded, therefore, that the video recording was admissible.

The trial court certified its order for immediate review, and the Court of Appeals granted Nuckles's application for an interlocutory appeal.[7] After noting that the trial court applied the wrong definition of "private place,"[8] the Court of Appeals affirmed the trial

---

[7] Following the trial court's denial of the motion to suppress, all three defendants initially filed applications for interlocutory review in this Court. We denied Agyeman's application and transferred the applications of Turman and Nuckles to the Court of Appeals based on lack of jurisdiction. Only Nuckles filed a petition for certiorari in this Court.

[8] At the time that the video recording was made, the statutory term "private place" was defined in this context as "a place where one is entitled reasonably to expect to be safe from casual or hostile intrusion or surveillance." OCGA § 16-11-60 (3) (2002). However, in denying Nuckles's motion, the trial court instead applied the current definition of "private place," which was adopted by the legislature in a 2015 amendment. See Ga. L. 2015, p. 1047 § 1.

court's ruling, holding that "even if Dempsey's room was a 'private place'" under OCGA § 16-11-62 (2), the recording fell under the Security Exception because it was installed for the purpose of determining who was entering the room, whether someone was stealing Dempsey's belongings, and whether the rehab facility employees were neglecting him. The Court of Appeals did not address whether Nuckles was "an owner or occupier of real property" or whether his room was an area "where there is no reasonable expectation of privacy." Following the decision of the Court of Appeals, Nuckles filed a petition for certiorari, which this Court granted to consider the issue of whether the video recording fell within the Security Exception.[9]

That amendment changed the definition of "private place" to "a place where there is a reasonable expectation of privacy." OCGA § 16-11-60 (3). The trial court found that because Nuckles had no reasonable expectation of privacy in Dempsey's room, it was not a private place. In reaching its alternative holding that the video fell within the Security Exception, the trial court assumed that Nuckles had a reasonable expectation of privacy and based its holding on a determination that the recording was made for security purposes, which brought it under the Security Exception.

[9] Generally, the first step in determining whether the video recording was made in violation of OCGA § 16-11-62 (2) would be to consider whether it was made in a "private place," as that term was defined at the time of the

8

1. In analyzing this issue, "we first look to the text [of OCGA § 16-11-62 (2) (B),] because a statute draws its meaning from its text." *Crowder v. State of Ga.*, 309 Ga. 66, 69 (2) (844 SE2d 806) (2020) (citation and punctuation omitted). The text of the Security Exception sets out the following requirements for its application: (1) the video recording must be made by "an owner or occupier of real property"; (2) "to use for security purposes, crime prevention, or crime detection"; (3) with a device "to observe, photograph, or record the activities of persons who are on the property or an approach thereto"; (4) in an area "where there is no reasonable expectation of privacy[.]" OCGA § 16-11-62 (2) (B).

Nuckles does not contest that the video recording in this case met the second and third of these requirements, that it was made for security purposes to record the activities of persons on the property. However, she takes issue with the first and fourth

recording. See *Major v. State*, 301 Ga. 147, 147 n.1 (800 SE2d 348) (2017) (applying version of statute in effect at time incident took place). However, the Court of Appeals confined its holding to the Security Exception, concluding that the recording fell within the exception even if Dempsey's room were a "private place" under the statute, and our review is limited to that holding.

requirements. Nuckles contends that the exception does not apply because Dempsey was not an owner or occupier of real property and the recording took place in a patient's room, which is an area where there is a reasonable expectation of privacy.

2. With regard to her first contention, Nuckles argues that the phrase "owner or occupier of real property," regardless of its context, is a legal term of art referring only to a person who has ultimate control over the property and is responsible for its maintenance, protection, and guests. Because Dempsey had no such control of, or responsibility for, the rehab facility property, Nuckles asserts that he was not an owner or occupier of real property and the Security Exception does not apply.

We begin our analysis of whether the Security Exception applied to the video recording in this case by considering the meaning of "owner or occupier of real property" under OCGA § 16-11-62 (2) (B). In doing so, we must look to the text of the statute, affording it "its plain and ordinary meaning, *viewed in the context in which it appears*, and read [it] in its most natural and reasonable

10

way." *Carpenter v. McMann*, 304 Ga. 209, 210 (817 SE2d 686) (2018) (citation and punctuation omitted; emphasis supplied). See also *Deal v. Coleman*, 294 Ga. 170, 172-73 (1) (a) (751 SE2d 337) (2013).

Because the State does not contend, and the record contains no evidence showing, that Dempsey had any ownership interest in the rehab facility,[10] we limit our consideration to whether Dempsey was an "occupier of real property" under the statute. In that regard, it is clear that Dempsey's room in the rehab facility must be considered "real property" under Georgia law because it is part of a building affixed to realty. See *Fayette County Bd. of Tax Assessors v. Ga. Utilities Co.*, 186 Ga. App. 723, 725 (1) (368 SE2d 326) (1988) ("Under our law, real property includes not only the land but all improvements thereon." (citing *Simpson v. Tate*, 226 Ga. 558, 559 (1) (176 SE2d 62) (1970)). See also Black's Law Dictionary 1218 (6th ed. 1990) (defining "real property" at the time the legislature

---

[10] See, e.g., OCGA § 16-1-3 (10) (defining the term "owner" as used in Title 16 as "a person who has a right to possession of property which is superior to that of a person who takes, uses, obtains, or withholds it from him and which the person taking, using, obtaining, or withholding is not privileged to infringe.").

11

adopted the Security Exception as "[l]and, and generally whatever is erected or growing upon or affixed to land").

We turn next to the meaning of "occupier" in the term "occupier of real property" under the Security Exception. Unlike the term "private place," "occupier" is not defined in this context under OCGA § 16-11-60. Likewise, OCGA § 16-1-3 does not provide a definition of "occupier," as opposed to the term "owner." But giving the term "occupier" its ordinary, natural, and most basic meaning, it is defined as one who occupies, and in the context of the Security Exception, one who occupies real property. When the General Assembly adopted the Security Exception in 2000, the term "occupy" was commonly defined in such a context as "to take possession of [or] inhabit," Webster's New Dictionary 204 (1997); "to dwell or reside in," American Heritage Dictionary 1215 (4th ed. 2000); and "to have, hold, or take as a separate space[,] possess[, or] reside in[,]" Random House Webster's College Dictionary 914 (2d ed. 1999). These definitions also comport with the definition of "occupier" in Black's Law Dictionary, which at the time identified that term as

12

synonymous with "occupant," and defined "occupant" as a "person in possession" or "one who has actual use, possession or control of a thing." Black's, at 1078-79.

Accordingly, giving the phrase "occupier of real property" its natural, ordinary meaning in the context of the statute, we conclude that Nuckles's proposed definition is too narrow, as it limits the phrase's meaning to only someone with control and responsibility for the real property and excludes anyone who otherwise has the legal right to stay on, or lawful possessory rights in, the property.[11]

Instead, we interpret the term "occupier of real property" as used in OCGA § 16-11-62 (2) (B) to be broad enough to encompass someone like Dempsey, who had the legal right to occupy, and

_____

[11] In support of this argument, Nuckles cites several statutes that employ phrases similar to "owner or occupier of real property." See also OCGA §§ 2-6-39 (b) & (c) (addressing authority of soil and water conservation supervisors to enter land); 16-11-38 (prohibiting wearing a mask on another's property without written permission); 36-72-4 (prohibiting the disturbance of a cemetery without a proper permit); and 51-3-1 (addressing premises liability). However, she fails to show how the legislature's use of similar language in these statutes, each addressing different subject matters, supports her asserted definition of "owner or occupier of real property" under the Security Exception.

13

indeed reside in, the area captured on the video recording. The evidence at the hearing showed that Timothy signed paperwork in connection with Dempsey's admission to the rehab facility,[12] and the facility received payment for the services and accommodations it provided to Dempsey, both from insurance and from his family. Dempsey moved into the facility for the second time on February 7, 2014, and stayed in the same room until his death on February 27. He stored his personal items in the room, including clothes, toiletries, a blanket, and photographs. Under these circumstances, Dempsey must be considered an occupier of real property within the meaning of the Security Exception, with the authority to conduct video surveillance for the purposes listed in the exception "in areas where there is no reasonable expectation of privacy."[13]

---

[12] This paperwork is not included in the record, and no other description of those documents is provided.

[13] Although Nuckles asserts that under *Starr v. Emory University*, 93 Ga. App. 864 (93 SE2d 399) (1956), Dempsey was merely an invitee, not an occupier, of the rehab facility, that case has no application here. In *Starr*, the plaintiff, a hospital patient, slipped and fell in the central aisle of an eight-bed hospital ward, in which she had a bed, and she brought suit against the hospital for her injuries. See id. at 865-66. The Court of Appeals only considered the issue of whether the hospital had potential liability for the

14

3. Nuckles argues, however, that Dempsey's room was an area where there *was* a reasonable expectation of privacy, and thus the Security Exception does not apply to the video recording in this case. Nuckles asserts that "a reasonable expectation of privacy" should be determined by the "area" or place where the recording is made, not by the personal expectation of privacy of any individual in that location, and she asserts that a patient's room is clearly a place where there is a reasonable expectation of privacy.

This Court has not yet considered the meaning of "reasonable expectation of privacy" in the context of OCGA § 16-11-62 (2) (B), but in addressing other provisions of OCGA § 16-11-62 (2), we have previously "looked to Fourth Amendment jurisprudence as a guide when interpreting the scope of privacy protected by [the statute]." See *State v. Cohen*, 302 Ga. 616, 629 (2) (b) (807 SE2d 861) (2017) (citing *Burgeson v. State*, 267 Ga. 102, 107 (3) (d) (475 SE2d 580)

plaintiff's injuries and thus whether the trial court properly sustained the hospital's general demurrer to plaintiff's complaint. See id. at 866. The court did not address the issue of whether the plaintiff had any rights to the area based on a legal occupancy of a bed in the ward.

(1996); *Quintrell v. State*, 231 Ga. App. 268, 270-71 (1) (499 SE2d 117) (1998)). Although in *Cohen*, some Justices questioned whether it was appropriate to apply Fourth Amendment law to the portion of the statute at issue in that case,[14] we find that Fourth Amendment precedent is particularly instructive for our consideration of the meaning of "a reasonable expectation of privacy" under the Security Exception because that phrase had developed into a term of art relating to privacy rights by the time the Security Exception was enacted.

As Presiding Justice Nahmias explained in his concurring opinion in *Cohen*, Fourth Amendment jurisprudence was revolutionized "[w]hen in December [1967] the United States Supreme Court ushered in a new standard for determining the reach

---

[14] See *Cohen*, 302 Ga. at 633 (Nahmias, J., concurring specially) (questioning the application of Fourth Amendment precedent to the pre-2015 definition of "private place," because the legislature adopted that definition before the Fourth Amendment opinions upon which the majority relied were issued); id. at 635-36 (Grant, J., concurring specially) (questioning the application of Fourth Amendment precedent to that definition because the precedent was not in place when the legislature adopted the definition; the Fourth Amendment addresses only governmental interference with privacy rights, while the scope of the statute is not so limited; and the *Cohen* case involved a private actor).

16

of the constitutional privacy protection and first used the term 'reasonable expectation of privacy' in *Katz v. United States*, 389 U.S. 347, 360 (88 SCt 507, 19 LE2d 576) (1967) (Harlan, J., concurring)." *Cohen*, 302 Ga. at 633. Although courts originally analyzed the privacy rights protected by the Fourth Amendment under principles of common law trespass to property, the United States Supreme Court's decision in *Katz* and its progeny "deviated from that exclusively property-based approach[,]" and Justice Harlan's concept of "a reasonable expectation of privacy" became equated with the principle that "the Fourth Amendment protects people, not places." *United States v. Jones*, 565 U.S. 400, 405-06 (II) (A) (132 SCt 945, 181 LE2d 911) (2012) (citation and punctuation omitted).

The General Assembly adopted the Security Exception in 2000, see Ga. L. 2000, p. 876, § 2, more than 30 years after courts began recognizing that the phrase "reasonable expectation of privacy" signaled an individualized approach to privacy rights under the Fourth Amendment. "The primary determinant of a text's meaning is its context," and "[f]or context, we may look to other provisions of

17

the same statute, the structure and history of the whole statute, and the other law—constitutional, statutory, and common law alike—that forms the legal background of the statutory provision in question." *Gray v. State*, 310 Ga. 259, 261-62 (2) (850 SE2d 36) (2020) (citations and punctuation omitted). Thus, we presume that the General Assembly was aware of this jurisprudence when it chose to employ that language in the exception. See id.; *Davis v. Kaiser Foundation Health Plan of Ga., Inc.*, 271 Ga. 508, 509 (521 SE2d 815) (1999).

Applying that jurisprudence to this context, we conclude that the reasonable expectation of privacy under the Security Exception must be considered in light of the individual expectations of the persons in the area where the video recording occurred and not, as Nuckles argues, solely based on a classification of that area. This determination must be made based on the timing and circumstances under which the individual was recorded. Therefore, courts must consider an individual's status in relation to the location, as one person present in a particular area may have a reasonable

expectation of privacy, while another person may not. See, e.g., *Smith v. State*, 284 Ga. 17, 21 (3) (663 SE2d 142) (2008) (The registered guest of a hotel room has an expectation of privacy in that room, but whether a guest of the renter has the same protection is determined based on the guest's status: if only a casual visitor, as opposed to an overnight guest, the guest does not have the same expectation of privacy as the renter.).

Also, whether an individual has a reasonable expectation of privacy may depend on factors such as the conduct occurring, or other people present, at the time of the recording. See, e.g., *Katz*, 389 U.S. at 351 ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."); *Bowling v. State*, 289 Ga. 881, 884 (2) (a) (717 SE2d 190) (2011) (where defendant's medical exam was conducted in the presence of law enforcement officers, he could not claim an expectation of privacy in his medical records to the extent that they contain information disclosed in the officers' presence). See also *Friedenberg v. School Bd. of Palm Beach County*, 911 F3d 1084, 1105

(V) (A) (11th Cir. 2018) ("The expectation of privacy is real and not insubstantial, but expectations will differ as context changes," noting the United States Supreme Court's express recognition that in a work environment "that is 'regulated pervasively to ensure safety' there are lessened expectations of privacy") (quoting *Skinner v. R. Executives' Labor Assn.*, 489 U.S. 602, 627 (III) (C) (109 SCt 1402, 103 LE2d 639) (1989).).

Therefore, regardless of whether Dempsey or others had an expectation of privacy in the area recorded, we must determine whether Nuckles had a reasonable expectation of privacy in that area at the time of the recording. Dempsey's room was part of Nuckles's workplace, and although courts have recognized that under the Fourth Amendment, "[w]ithin the workplace context, . . . employees may have a reasonable expectation of privacy against intrusions by police," *Tidwell v. State*, 285 Ga. 103, 104-05 (1) (674 SE2d 272) (2009) (quoting *O'Connor v. Ortega*, 480 U.S. 709, 716 (II) (107 SCt 1492, 94 LE2d 714) (1987)), the recognition of such a reasonable expectation of privacy generally has been limited to

areas over which an employee had exclusive authority, including areas where an employee kept his or her personal belongings. See *O'Connor*, 480 U.S. at 715-16 (II) (state hospital employee had a reasonable expectation of privacy in his desk and file cabinet where the desk and file cabinet in question were used exclusively by the defendant, he regularly kept personal items in them, and there was no regulation or policy discouraging employees from storing personal items in their desks and file cabinets); *Tidwell*, 285 Ga. at 105 (1) (holding that defendant had a reasonable expectation of privacy in a wooden locker he maintained just outside his workplace sleeping quarters); *Harper v. State*, 283 Ga. 102, 107 (2) (657 SE2d 213) (2008) (defendant had reasonable expectation of privacy in her desk at work). Thus, the Supreme Court has held under the Fourth Amendment that "the question whether an employee has a reasonable expectation of privacy must be addressed on a case-by-case basis[,]" considering "[t]he operational realities of the workplace." *O'Connor*, 480 U.S. at 717-18 (II).

The evidence presented at the hearing demonstrates that

Nuckles never exercised exclusive control over Dempsey's room and never used it for personal reasons. She testified that she did not pay any rent for the use of the room; she never slept or changed clothing there; she never used Dempsey's bathroom; and she never kept her personal items in his room. Instead, it appears that Nuckles was engaged in her work duties at the time the recording was made, and there is nothing to suggest that she would not have been subject to supervision or observation by other rehab facility employees in the performance of her duties. In fact, Nuckles was charged along with two other co-defendants who apparently also were in Dempsey's room at the time of the video recording. Under these circumstances, we conclude that the State carried its burden of showing that Nuckles had no reasonable expectation of privacy in the area captured on the video recording at the time she was recorded,[15] and thus the trial court properly denied her motion to suppress.

*Judgment affirmed. Melton, C. J., Nahmias, P. J., and Boggs, Peterson, Bethel, and Ellington, JJ., concur. Warren, J., not*

---

[15] See *Philpot v. State*, 300 Ga. 154, 160 (794 SE2d 140) (2016) (the State has the burden of establishing the admissibility of evidence challenged by a motion to suppress).

*participating*.

DECIDED DECEMBER 21, 2020.

Certiorari to the Court of Appeals of Georgia — 352 Ga. App. XXV.

*Gerard B. Kleinrock*, for appellant.

*Sherry Boston, District Attorney, Deborah D. Wellborn, Jeanne M. Canavan, Maria O. Banjo, Jason M. Rea, Assistant District Attorneys*, for appellee.

*Arnall Golden Gregory, Jason E. Bring, Glenn P. Hendrix; Gautreaux Law, Jarome Gautreaux; Caleb F. Walker; Warshauer Law Group, Lyle G. Warshauer*, amici curiae.