

## SUPREME COURT OF GEORGIA

Atlanta      November 2, 2017

The Honorable Supreme Court met pursuant to adjournment.

The following order was passed:

It appearing that the enclosed opinion decides a second-term appeal, which must be concluded by the end of the August Term on November 18, 2017, it is ordered that a motion for reconsideration, if any, including any motions submitted via the Court's electronic filing system, must be **received** in the Clerk's Office by **10:00 a.m. on Thursday, November 9, 2017.**

SUPREME COURT OF THE STATE OF GEORGIA

Clerk 's Office, Atlanta

I certify that the above is a true extract from the minutes of the Supreme Court of Georgia.
Witness my signature and the seal of said court hereto affixed the day and year last above written.

, Clerk

In the Supreme Court of Georgia

Decided: November 2, 2017

S17A1265. THE STATE v. COHEN.

MELTON, Presiding Justice.

According to the briefs, Mye Brindle worked as a housekeeper and personal assistant to Joe Rogers, who was married. During her employment with Rogers, the two became involved sexually.[1] In June 2012, Brindle hired attorneys David Cohen and John Butters to represent her on a potential claim of sexual harassment. On June 20, 2012, without Rogers' knowledge or consent to be video recorded, Brindle allegedly used a "spy" camera to secretly record video of Rogers naked in his bathroom and bedroom, as well as video of a sexual encounter between Rogers and herself inside his bedroom. The video recording was delivered to attorney Cohen, and Brindle resigned from her position with Rogers. On or about July 16, 2012, Rogers received a demand

---

[1] The parties dispute the extent to which this relationship was consensual. Rogers claims that the relationship was consensual, whereas Brindle went to police in late September 2012 to report that Rogers had forced himself upon her sexually on numerous occasions.

letter from attorney Cohen relating to the potential sexual harassment claim that he and Butters were prepared to file on Brindle's behalf.[2]

After extensive civil litigation between Rogers and Brindle that is not relevant to the current appeal, on June 17, 2016, Brindle and her attorneys (hereinafter collectively referred to as the "defendants") were charged in the Superior Court of Fulton County with conspiracy to commit extortion under OCGA § 16-8-16 (Count 1), conspiracy to commit unlawful surveillance (Count 2), and conducting unlawful surveillance under OCGA § 16-11-62 (Count 3). Brindle was also charged individually with one additional count of conducting unlawful surveillance under OCGA § 16-11-62 (Count 4).[3] The indictment was largely based on the defendants' prior actions involving an alleged conspiracy to secretly video record and then actually record Rogers in the bathroom and bedroom of his home on June 20, 2012, and then sending Rogers the July 16, 2012 litigation demand letter. Through multiple motions filed on September 19, 2016 and October 19, 2016, the defendants filed a general demurrer to dismiss

---

[2] The demand letter does not appear in the record.

[3] Count 4 of the indictment, relating only to Brindle, involved the recording of another individual who was also at Rogers' home on the day that Brindle was recording the sexual encounter with Rogers.

2

the indictment against them and to have OCGA §§ 16-8-16 (a) (3),[4] 16-11-62 (2),[5] and 16-11-66 (a)[6] declared unconstitutional. Following a hearing, on November 30, 2016, the trial court issued an order granting the defendants' general demurrer to the indictment. After finding that the indictment failed to show that the defendants had committed any crimes under the relevant statutes, the trial court went on to conclude that OCGA § 16-8-16 (a) (3) was unconstitutionally overbroad on its face, and further declared that OCGA §§ 16-11-62 (2) and 16-11-66 (a) were unconstitutionally vague because "persons of ordinary intelligence [could not] be expected to determine what is permitted and prohibited by these [two] statutes." Accordingly, the trial court dismissed all

---

[4] "A person commits the offense of theft by extortion when he unlawfully obtains property of or from another person by threatening to . . . [d]isseminate any information tending to subject any person to hatred, contempt, or ridicule or to impair his credit or business repute."

[5] "It shall be unlawful for . . . [a]ny person, through the use of any device, without the consent of all persons observed, to observe, photograph, or record the activities of another which occur in any private place and out of public view [except where certain statutory exceptions contained in subsections (2) (A) -(D) apply]."

[6] "Nothing in Code Section 16-11-62 shall prohibit a person from intercepting a wire, oral, or electronic communication where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception."

counts of the indictment against all of the defendants.

The State appeals from this ruling, and, for the reasons that follow, we conclude that (1) while the trial court properly dismissed Count 1 of the indictment, the trial court erred by reaching the constitutional issue relating to OCGA § 16-8-16 (a) (3) in support of this result; and (2) the trial court erred in dismissing Counts 2, 3, and 4 of the indictment and in concluding that OCGA §§ 16-11-62 (2) and 16-11-66 (a) are unconstitutionally vague. We therefore affirm the portion of the trial court's order dismissing Count 1 of the indictment, vacate the portion of the trial court order's finding OCGA § 16-8-16 (a) (3) to be unconstitutionally overbroad on its face, and reverse the portion of the trial court's order dismissing Counts 2-4 of the indictment.

1. The State contends that the trial court erred in granting the defendants' general demurrer to Count 1 of the indictment. We disagree.

"A general demurrer challenges the sufficiency of the substance of the indictment, whereas a special demurrer challenges the sufficiency of the form of the indictment. [Cits.]" Bramblett v. State, 239 Ga. 336, 338 (1) (236 SE2d 580) (1977).

The true test of the sufficiency of an indictment that will withstand

a general demurrer is as follows: If all the facts which the indictment charges can be admitted [as true], and still the accused be innocent, the indictment is bad; but if, taking the facts alleged as premises, the guilt of the accused follows as a legal conclusion, the indictment is good.

(Citations and punctuation omitted.) Lowe v. State, 276 Ga. 538, 539 (2) (579 SE2d 728) (2003). We "review[] a trial court's ruling on a general . . . demurrer de novo in order to determine whether the allegations in the indictment are legally sufficient." (Footnote and punctuation omitted.) Smith v. State, 340 Ga. App. 457, 459 (797 SE2d 679) (2017).

Count 1 of the indictment states that the defendants were being charged

with the offense of CONSPIRACY TO COMMIT A FELONY O.C.G.A. §16-4-8,[7] for the said accused, in the County of Fulton and State of Georgia, on the 6th day of June, 2012, did unlawfully, together, conspire to commit the crime of EXTORTION O.C.G.A. §16-8-16, and at least one of those persons did an overt act to effect the object of said conspiracy, to wit:

OVERT ACTS

1.
On or about the 3rd day of June, 2012, JOHN BUTTERS, an

---

[7] "A person commits the offense of conspiracy to commit a crime when he together with one or more persons conspires to commit any crime and any one or more of such persons does any overt act to effect the object of the conspiracy."

attorney authorized to practice law in Georgia, contacted Thomas Hawkins, a private investigator, to arrange a meeting to discuss making a covert video recording of a wealthy individual without that person's knowledge or consent.

2.

On or about the 4th day of June, 2012, attorneys JOHN BUTTERS and DAVID COHEN met with private investigators Michael Deegan and Thomas Hawkins at the offices of Hawk Private Investigations ("Hawk P.I.") in Fulton County to discuss making a covert video recording of a wealthy person inside his residence without that person's knowledge or consent. BUTTERS and COHEN did not reveal the name of the wealthy person.

3.

At the conclusion of this meeting, Michael Deegan and Thomas Hawkins agreed to help JOHN BUTTERS and DAVID COHEN purchase the spy camera even after expressly stating to BUTTERS and COHEN that it would be illegal to covertly record someone in their residence without that person's knowledge or consent.

4.

On or about the 6th day of June, 2012, attorneys JOHN BUTTERS and DAVID COHEN met with investigator Michael Deegan a second time at the offices of Hawk P.I. in Fulton County. Accompanying BUTTERS and COHEN to this meeting was a person they identified as their client "Sam" and another person they identified as "Sam's mother." The purpose of this meeting was to further discuss the making of a covert video recording of a wealthy individual without that person's knowledge or consent.

5.

At the conclusion of the meeting at the offices of Hawk P.I. in Fulton County, DAVID COHEN purchased a spy camera made to look like a cell phone and designed to create covert video

6

recordings.

6.

On or about the 11th day of June, 2012, Michael Deegan delivered the spy camera to MYE BRINDLE, the person previously identified as "Sam," and showed her how to use it.

7.

On or about the 20th day of June, 2012, MYE BRINDLE secretly videotaped the victim, later identified as JOE ROGERS, without his knowledge or consent, naked in the bathroom of his residence at [his home address] in Fulton County.

8.

On or about the 20th day of June, 2012, MYE BRINDLE secretly videotaped JOE ROGERS, without his knowledge or consent, naked in the bedroom of his residence.

9.

On or about the 20th day of June, 2012, MYE BRINDLE secretly videotaped a sexual encounter between her and JOE ROGERS, without his knowledge or consent, which took place in the bedroom of his residence.

10.

On or about the 22nd day of June, 2012, MYE BRINDLE delivered the spy camera and the video recordings referenced in Overt Acts 7 through 9 to Michael Deegan.

11.

On or about the 22nd day of June, 2012, Michael Deegan had the video recording made by MYE BRINDLE of JOE ROGERS on June 20, 2012 placed on DVD(s) and then delivered the DVD(s) to DAVID COHEN in Marietta, Georgia.

12.

On or about the 16th day of July, 2012, DAVID COHEN sent a letter to JOE ROGERS threatening a lawsuit on behalf of MYE BRINDLE. Said letter stated that there were "[n]umerous audio and video recordings" of sexual harassment and abuse by ROGERS upon BRINDLE. This letter sought to settle the matter before public litigation so that Joe Rogers may avoid potential "media attention . . . intrusive governmental investigations, Department of Justice, Attorneys General or SEC involvement, as well as civil and criminal charges . . . ."

13.

On or about the 2nd day of August, 2012, JOHN BUTTERS, DAVID COHEN, and Hylton Dupree, attorneys for MYE BRINDLE met with Robert Ingram and Jeffrey Daxe, attorneys for JOE ROGERS, to discuss the claims listed in the July 16, 2012 letter addressed to ROGERS. COHEN played an edited video of the sexual encounter that was secretly recorded by MYE BRINDLE on June 20, 2012, in the bedroom of Joe Rogers' residence, without his knowledge or consent, at [his address] in Fulton County. BUTTERS informed Robert Ingram and Jeffrey Daxe that MYE BRINDLE wanted "millions" of dollars to settle her claim.

14.

On or about the 2nd day of August, 2012, DAVID COHEN told attorneys Robert Ingram and Jeffrey Daxe that he possessed videos of other sexual encounters between JOE ROGERS and MYE BRINDLE. Said statements made by COHEN furthered the extortion plot by asserting that there was another embarrassing video of ROGERS, which would tend to subject ROGERS to even more contempt and ridicule.

15.

On or about the 14th day of September, 2012, mediation was held in which, JOHN BUTTERS, DAVID COHEN, and Hylton Dupree

8

asked for twelve million dollars to settle MYE BRINDLE'S claims which they argued were supported by the June 20, 2012 video of JOE ROGERS taken without his knowledge or consent.

16.

On or about the 19th day of September, 2012, DAVID COHEN filed a civil lawsuit in Fulton County on behalf of MYE BRINDLE, which stated that BRINDLE "made audio and video recordings of some of the incidents of sexual harassment and battery" which occurred in Fulton County and at Sea Island in Glynn County, Georgia.

17.

On or about midnight of the 28th day of September, 2012, MYE BRINDLE and one of her attorneys went to the Atlanta Police Department, hours before a court order sealing the record in Cobb County took effect, to report that JOE ROGERS physically forced himself sexually upon BRINDLE on numerous occasions.

18.

On or about the 9th day of October, 2012, the Honorable Judge Susan Forsling of Fulton County State Court, questioned DAVID COHEN during a hearing about the existence of another covert videotape of JOE ROGERS and MYE BRINDLE engaged in a sexual encounter. COHEN responded that ROGERS was "[p]artially naked" in the videotape. Said statements made by COHEN furthered the extortion plot by asserting that there was another embarrassing video of ROGERS, which would tend to subject ROGERS to even more contempt and ridicule.

19.

On or about the 24th day of October, 2012, JOHN BUTTERS, DAVID COHEN, and MYE BRINDLE served discovery requests on JOE ROGERS asking him to admit that a particular video recording labeled as "Exhibit 1 hereto is a true and correct video

9

recording of a sexual encounter involving ROGERS and BRINDLE at the Roger's [sic] Sea Island residence." Said request was made by BUTTERS and COHEN to further the extortion plot by asserting that there was another embarrassing video of ROGERS, which would tend to subject ROGERS to even more contempt and ridicule.

Said offense in the County of Fulton and State of Georgia – contrary to the laws of said State, the good order, peace and dignity thereof[.]

With respect to the alleged crime that formed the basis for the purported conspiracy under Count 1 in this case:

A person commits the offense of theft by extortion when he *unlawfully* obtains property of or from another person by *threatening* to . . . [d]isseminate any information tending to subject any person to hatred, contempt, or ridicule or to impair his credit or business repute.

(Emphasis supplied.) OCGA § 16-8-16 (a) (3). Accordingly, in order to be found guilty of conspiracy to commit extortion under Count 1, the defendants had to conspire to unlawfully obtain property by "threatening to . . . [d]isseminate any information tending to subject [Rogers] to hatred, contempt, or ridicule or to impair his credit or business repute" and commit an overt act to effect the objective of obtaining property from Rogers. OCGA § 16-8-16 (a) (3) and OCGA § 16-4-8. However, a review of the indictment reveals that,

10

regardless of any of the alleged overt acts that could have otherwise shown the existence of a conspiracy to commit some other crime (see discussion in Division 2, infra), there was no agreement to unlawfully obtain property from Rogers by "threatening" him in this case in any manner that could serve as a proper basis for a charge of illegal extortion under OCGA § 16-8-16 (a) (3). As explained more fully below, for this reason, the allegations in the indictment are legally insufficient to support a charge of conspiracy to commit extortion.

The alleged threat in this case is covered in "Overt Act" number 12 of Count 1, which, again, states that

> [o]n or about the 16th day of July, 2012, DAVID COHEN sent a letter to JOE ROGERS *threatening a lawsuit on behalf of MYE BRINDLE*[, and that this] letter stated that there were "[n]umerous audio and video recordings" of sexual harassment and abuse by ROGERS upon BRINDLE. This letter *sought to settle the matter before public litigation* so that Joe Rogers may avoid potential "media attention . . . intrusive governmental investigations, Department of Justice, Attorneys General or SEC involvement, as well as civil and criminal charges . . . ."

(Emphasis supplied.) From the plain language of the indictment, the alleged threat here was to file a lawsuit against Rogers and use the video as evidence in a court of law in the context of possible litigation. The indictment does not allege any threat (express or implied) to release the information to anyone

outside of the potential court proceedings if Rogers did not pay Brindle a certain amount of money.[8] Compare <u>Flatley v. Mauro</u>, 139 P3d 2, 21 (II) (B) (3) (Cal. 2006) (attorney committed extortion under California law where he threatened "to publicly accuse [the defending party] of rape and to report and publicly accuse him of other unspecified [crimes] unless he 'settled' by paying" at least $1 million to the attorney's client).

However, because any threat to "[d]isseminate any information tending to subject [another] person to hatred, contempt, or ridicule or to impair his credit or business repute" could, in theory, amount to extortion under OCGA § 16-8-16 (a) (3), the language of OCGA § 16-8-16 could be read to be broad enough to include "threats" of public litigation as unlawful and extortionate actions that could subject a person to criminal liability under the statute. But, a threat of litigation, by itself, is not unlawful. For this reason, we find that, based on the authority of other courts that have examined similar issues, mere "threats

---

[8] In this regard, we note that the remaining Overt Acts mentioned in Count 1 that deal with the creation and existence of alleged secret recordings and efforts to settle the case before commencing litigation also do not contain any agreement to threaten Rogers with the release of the recordings outside of litigation.

to sue cannot constitute criminal extortion." United States v. Pendergraft, 297 F3d 1198, 1205 (IV) (A) (1) (11th Cir. 2002). See also Buckley v. Directv, Inc., 276 FSupp2d 1271, 1275-1276 (N.D. Ga. 2003) ("[T]he Court is not aware of any authority holding that a demand to settle a claim before pursuing litigation amounts to extortion. In fact, such demand letters do not fit the legal definition of extortion [under OCGA § 16-8-16 (a)]").

Our construction of OCGA § 16-8-16 (a) (3) is consistent with this Court's "duty to construe a statute in a manner which upholds it as constitutional, if that is possible." (Citation omitted.) Cobb Cty. Sch. Dist. v. Barker, 271 Ga. 35, 37 (1) (518 SE2d 126) (1999). Indeed, if a mere threat of legitimate litigation could serve as a proper basis for a charge of extortion, OCGA § 16-8-16 (a) (3) could be applied in an overbroad and unconstitutional manner that would run afoul of First Amendment principles protecting the right of individuals to petition the government for a redress of grievances. See Borough of Duryea v. Guarnieri, 564 U.S. 379, 387 (II) (131 SCt 2488, 180 LEd2d 408) (2011) ("The right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government. . . [and] the Petition Clause protects the right of individuals  to appeal to courts and other

13

forums established by the government for resolution of legal disputes")
(citations and punctuation omitted). We decline to adopt such a broad and
potentially unconstitutional construction of the statute.

Because the alleged extortion in this case was based on a mere threat to
file a lawsuit, and because there is no allegation in the indictment that the
threatened litigation itself was somehow unlawful, the defendants could admit
to all of the allegations in Count One of the indictment and still be innocent of
the crime of conspiracy to commit extortion.[9] See, e.g., Brown v. State, 322 Ga.

---

[9] This is not to say that a charge of extortion could not be "based on
intentional falsehoods or on knowingly frivolous claims." See Bill Johnson's
Rests. v. NLRB, 461 U.S. 731, 743 (III) (B) (103 SCt 2161, 76 LE2d 277)
(1983) ("The first amendment interests involved in private litigation . . . are not
advanced when the litigation is based on intentional falsehoods or on knowingly
frivolous claims") (footnote and punctuation omitted). However, where private
litigation is not based on such intentional falsehoods or the like, a demand letter
that merely threatens a lawsuit in connection with that potential litigation could
not serve as a proper basis for a charge of extortion, as a party's right to pursue
such litigation is protected by the First Amendment. See Borough of Duryea,
supra. Here, again, there is no allegation in the indictment that the legal grounds
supporting the threatened litigation in this case were based on intentional
falsehoods or that the lawsuit was otherwise somehow unlawful such that the
protection typically afforded to private litigation by the First Amendment right
to petition the government for a redress of grievances would no longer be
available. Thus, we need not decide any issue in this case relating to potentially
baseless litigation, as that question is not properly before us based on the
indictment as written. See Davis & Brandon v. Seaboard A. L. R. Co., 136 Ga.

14

App. 446, 455 (3) (745 SE2d 699) (2013) ("[E]xercising one's right to file a lawsuit, or . . . conspiring with others to file a lawsuit, in and of itself, does not constitute a "threat" as required to support the crimes [of influencing or threatening witnesses in official proceedings]"). Accordingly, the trial court properly granted the defendants' general demurrer to this Count. See Lowe, supra.      In light of the trial court's proper conclusion that Count 1 of the indictment failed to sufficiently allege a crime against the defendants under OCGA § 16-8-16 (a) (3) as a matter of law, the trial court did not need to decide any issue regarding the constitutionality of OCGA § 16-8-16 (a) (3). See, e.g., Board of Tax Assessors v. Tom's Foods, Inc., 264 Ga. 309, 310 (444 SE2d 771)

---

278, 282 (71 SE 428) (1911) ("We think it would be a bad precedent to have the decision of this court invoked upon mere theoretical questions"). If, however, the defendants had been charged with threatening baseless litigation as a means of unlawfully obtaining property from Rogers, although this might serve as a proper basis for a charge of extortion, the defendants would still have an opportunity to defend against such an accusation at trial by proving that they had an honest claim to the property in question. See OCGA § 16-8-16 (c) ("It is an affirmative defense to prosecution based on paragraph . . . (3) . . . of subsection (a) of this Code section that the property obtained by threat of accusation, exposure, legal action, or other invocation of official action was honestly claimed as restitution or indemnification for harm done in the circumstance to which such accusation, exposure, legal action, or other official action relates or as compensation for property or lawful services").

15

(1994) (It "is well established that this court will never decide a constitutional question if the decision of the case presented can be made upon other grounds") (citations and punctuation omitted). We therefore vacate that portion of the trial court's order purporting to declare OCGA § 16-8-16 (a) (3) to be unconstitutionally overbroad on its face.

2. The State also urges that the trial court erred in granting the defendants' general demurrer to Counts 2-4 of the indictment. With respect to these Counts, the State is correct.

Count 2 of the indictment charged the defendants with

CONSPIRACY TO COMMIT A FELONY O.C.G.A. §16-4-8, for the said accused, in the County of Fulton and State of Georgia, on the 20th day of June, 2012, did unlawfully, together, conspire to commit the crime of UNLAWFUL EAVESDROPPING OR SURVEILLANCE O.C.G.A. §16-11-62, and at least one of [the defendants] did [one of the Overt Acts alleged in numbers 1-13 of Count 1] to effect the object of said conspiracy.

Count 3 charged the defendants with

UNLAWFUL EAVESDROPPING OR SURVEILLANCE O.C.G.A. §16-11-62, for the said accused, in the County of Fulton and State of Georgia, on the 20th day of June, 2012, through the use of a SPY CAMERA, a device, without the consent of all persons observed, did unlawfully record the activities of JOE ROGERS which occurred at [his home address], a private place, out of the public view.

16

Finally, Count 4 charged Brindle individually with

UNLAWFUL EAVESDROPPING OR SURVEILLANCE O.C.G.A. §16-11-62, for the said accused, in the County of Fulton and State of Georgia, on the 20th day of June, 2012, through the use of a SPY CAMERA, a device, without the consent of all persons observed, did unlawfully record the activities of KATHERINE MARIE MAYNARD which occurred at [Rogers' home address], a private place, out of the public view.

All of these Counts, whether based on a conspiracy involving a prior agreement and certain overt acts or based on direct violations of OCGA §16-11-62, hinge upon whether the facts alleged would show a potential violation of or an agreement to violate OCGA § 16-11-62 (2). That statute states in relevant part that

[i]t shall be unlawful for . . . [a]ny person, through the use of any device, without the consent of all persons observed, to observe, photograph, or record the activities of another which occur in any private place and out of public view [except where certain statutory exceptions contained in subsections (2) (A)-(D) apply].

The defendants contend that no violation of OCGA §16-11-62 (2) has been sufficiently alleged in the indictment because (a) the defendants did not have to seek the consent of all persons observed in the video created by Brindle in order to video record Rogers or any other person in his home; and (b) the video

17

recording itself did not take place in a private place and out of the public view. Both of these contentions are unavailing.

a. *OCGA §16-11-62 (2) requires the consent of all persons who will be video recorded before such persons can be video recorded in a private place and out of the public view.*

Under the plain language of OCGA § 16-11-62 (2), except when certain specific exceptions listed in the statute apply, a person cannot lawfully "use . . . any device" to "photograph . . . or record the activities" of others that occur in any private place and out of public view "without the consent of all persons observed." Setting aside for a moment the question whether the indictment sufficiently alleged that the video recordings here were made in a "private place and out of public view" (which we will address in Division 2 (b), infra), OCGA § 16-11-62 (2) states in no uncertain terms that "*all persons observed*" must consent to observational activities such as being *photographed* or having their own *activities* recorded with any device before someone else can legally record them through any means that allow them to be *observed*. The statute is written in terms that cover the types of *observational* surveillance that involve the capturing of images of another person on a spy camera without that person's consent. Here, the indictment alleges that Rogers and another person were video

18

recorded with a hidden spy camera in Rogers' home without their consent. Because video recording someone in such a manner falls into the category of surveillance activities covered by OCGA § 16-11-62 (2), and because Brindle and her attorneys allegedly took actions to agree to make a secret video and actually video record others without the consent of all of the persons being recorded, the defendants' actions fall within the purview of OCGA § 16-11-62 (2) and any alleged conspiracy to violate that statute (assuming that the video recordings were made in a "private place and out of public view").

However, the defendants contend that they were not legally required to obtain the consent of "all" of the persons being video recorded as required by the plain language of OCGA § 16-11-62 (2). Instead, they claim that they only needed to obtain the consent of one of the parties being recorded (Brindle) to avoid criminal liability in light of Georgia's "one-party-consent rule" contained in OCGA § 16-11-66 (a). The defendants are incorrect.

OCGA § 16-11-66 (a) states that

[n]othing in Code Section 16-11-62 shall prohibit a person from *intercepting a wire, oral, or electronic communication* where such person is a party to the *communication* or *one of the parties to the communication* has given prior consent to such interception.

19

(Emphasis supplied.) By its terms, OCGA § 16-11-66 (a) applies to intercepted "communications," such as voices involved in a telephone conversation or an electronic communication to which the intercepting person is a party. See Fetty v. State, 268 Ga. 365 (3) (489 SE2d 813) (1997); OCGA § 16-11-66 (a). The statute does not refer to observational surveillance such as video recording or photographing another person's activities, and it does not apply to nullify the clear statutory requirement of OCGA § 16-11-62 (2) that the consent of *all* parties is needed before a person may use any sort of spying device to photograph or video record the activities of another person in a private place and out of the public view. See Gavin v. State, 292 Ga. App. 402 (664 SE2d 797) (2008) (one-party-consent rule of OCGA § 16-11-66 did not apply to prevent prosecution of defendant for violation of OCGA § 16-11-62 where defendant did not obtain consent of person he video recorded). OCGA § 16-11-66 (a) only applies to intercepted wire, oral, or electronic *communications*, and does not authorize the creation of any secretly produced photograph or video of *observed activities* without the consent of all persons being photographed or video

recorded in a private place and out of the public view.[10] See Sims v. State, 297

Ga. 401 (2) n.2 (774 SE2d 620) (2015) (recognizing distinction between audible

communication in recording that is subject to one-party-consent rule and video

recording that is not). To the extent that the Court of Appeals' decision in State

v. Madison, 311 Ga. App. 31 (2) (a) (714 SE2d 714) (2011), can be read to

support the conclusion that the one-party consent rule of OCGA § 16-11-66 (a)

can apply to video recordings made without the consent of all persons observed

in private places and out of the public view, the case is overruled.

The indictment here does not fail based on OCGA § 16-11-66 (a) because

the one-party-consent rule does not apply in this case to shield the defendants

from potential criminal liability for conspiring to and creating a secret video

recording of others with a hidden camera in an ostensibly private place and out

of the public view without the consent of those other people whose activities

were being recorded.

---

[10] In this regard, OCGA § 16-11-66 (a) would apply to those aspects of OCGA §16-11-62 that deal with, for example, a person consenting to the recording of a conversation to which he or she was a party. See, e.g., OCGA §16-11-62 (1). However, the allegations in this case do not deal with electronic or other "communications," but with video surveillance that would not be subject to the one-party-consent exception created by OCGA § 16-11-66 (a).

*b. The indictment sufficiently alleges that the video recording took place in a private place and outside of the public view.*

As stated above, pursuant to OCGA § 16-11-62 (2), a person may not use any device "to observe, photograph, or record the activities of another which occur in any private place and out of public view" without the consent of all persons being observed. Despite the fact that the indictment here indicates that the video recording in this case took place at a private home, outside of the public view, and without the consent of all persons recorded, the defendants contend that the recording could not have taken place in a "private" place because Rogers could not have had any expectation of privacy in a place in which he had allowed Brindle to enter for purposes of carrying on a sexual relationship with her. We disagree.

At the time Brindle secretly video recorded Rogers and another person in Rogers' home in June 2012, a "private place" for purposes of OCGA §16-11-62 (2) was defined as "a place where one is entitled reasonably to expect to be safe from casual or hostile intrusion or surveillance." See former OCGA § 16-11-60

22

(3).[11] Based on the indictment as written, and based on the plain language of the former version of OCGA § 16-11-60 (3), both Rogers and the other person who was secretly video recorded in the residence in this case would have had a reasonable expectation to be safe from "hostile intrusion or surveillance" in the places where they were video recorded. The indictment also indicates that all video recording activities took place in spaces within the residence that were outside of the public view. Accordingly, for these reasons alone, the places involved in this case would meet the statutory definition of "private place[s]" that were "out of public view." OCGA § 16-11-62 (2); OCGA § 16-11-60 (3).

Although there is nothing in the plain language of former OCGA § 16-11-62 (2) to indicate that Rogers and the other person in the residence would no longer have a reasonable expectation to be safe from the "hostile intrusion" of having their activities secretly video recorded once Brindle entered the residence, and although there is nothing in the former version of OCGA § 16-11-62 (2) to show that the reasonable expectation to be safe from "hostile intrusion or surveillance" under the statute is coextensive with one's "reasonable

---

[11] The statute was amended in 2015 to define "private place" as "a place where there is a reasonable expectation of privacy."  OCGA § 16-11-60 (3).

23

expectation of privacy" under the Fourth Amendment to the United States Constitution, we have in the past looked to Fourth Amendment jurisprudence as a guide when interpreting the scope of privacy protected by OCGA § 16-11-62. See Burgeson v. State, 267 Ga. 102 (3) (d) (475 SE2d 580) (1996).[12] See also Quintrell v. State, 231 Ga. App. 268 (1) (499 SE2d 117) (1998). This

---

[12] This is *not* to say, however, that our analysis of one's reasonable expectation to be safe from "hostile or intrusive surveillance" under the former version of OCGA § 16-11-62 (2) is *limited* to the parameters set forth in Fourth Amendment jurisprudence. Indeed, the Fourth Amendment is concerned with stopping unauthorized intrusion by the *government* by *any* means into areas where a person has a reasonable expectation of privacy, whereas OCGA § 16-11-62 (2) is concerned with stopping unauthorized intrusion by *all* persons through the *specific* means of non-consensual photographing or video recording of their activities. It may very well be true that a person had a *greater* expectation to be free from the *specific* hostile intrusions of being video recorded or photographed under Georgia statutory law than he or she would have to be free from government intrusion for Fourth Amendment purposes. However, we need not decide that issue in this case, as our analysis above ultimately reveals that, even with the Fourth Amendment as a guide, Rogers and the other person who was video recorded in the residence did not lose their reasonable expectation to be free from the hostile intrusion of being secretly video recorded after Brindle entered the residence. Nor do we need to determine whether, by amending the statute in 2015 to define "private place" as "a place where there is a reasonable expectation of privacy" (OCGA § 16-11-60 (3)), the Legislature intended for the definition of private place under OCGA § 16-11-62 (2) to only reference the "reasonable expectation of privacy" that one would have under the Fourth Amendment, as the language under the 2015 amendment is not at issue in this case.

24

may be the case, in part, because the language from the former version of OCGA § 16-11-62 (2) tracks much of the language from the Model Penal Code, which states that a "'[p]rivate place' means a place where one may reasonably expect to be safe from casual or hostile instrusion or surveillance, but does not include a place to which the public or a substantial group thereof has access." Model Penal Code § 250.12 (1). Later commentaries to the Model Penal Code give further context to the meaning of "private place:"

> [T]he notion of a 'private place' focuses on the presence of a reasonable expectation of privacy rather than the generic category of location. In doubtful cases, it is left to the court to determine in functional terms whether the [surveillance] occurred in a 'private place' sufficient to invoke the provisions of [the anti surveillance statute].

Model Penal Code Part II Commentaries, vol. 3, at 434.

In this regard,

> the application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable, a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded . . . . This inquiry . . . normally embraces two discrete questions. The first is whether the individual, by his conduct, has exhibited an actual (subjective) expectation of privacy -- whether… the individual has shown that he seeks to preserve something as private. The second question is whether the individual's subjective expectation of privacy is one that society is prepared to recognize as reasonable . . . -- whether . . . the individual's expectation,

viewed objectively, is 'justifiable' under the circumstances.

(Citations and punctuation omitted.) Smith v. Maryland, 442 U.S. 735, 740 (II)

(A) (99 SCt 2577, 61 LE2d 220) (1979). See also Katz v. United States, 389

U.S. 347 (88 SCt 507, 19 LE2d 576) (1967).

For Fourth Amendment purposes, one who begins with a reasonable

expectation of privacy in a particular area such as his or her residence can lose

that expectation of privacy by inviting a guest into that otherwise private place.

See, e.g., United States v. Davis, 326 F3d 361 (2d Cir. 2003) (defendant did not

have reasonable expectation of privacy to prevent being video recorded with

hidden camera in jacket of confidential informant after inviting confidential

informant into his residence to sell drugs to the informant).[13] However, a person

---

[13] We note that this case has nothing to do with a person inviting police or other government officials into their home by consenting to a search or for other purposes. However, to the extent that OCGA §16-11-62 (2) could have been construed to apply to the actions of police officers making video recordings of others without their consent after being invited into someone's home, the Legislature made clear through a 2015 amendment to OCGA §16-11-62 (2) that police do not have to obtain the consent of all parties being video recorded in a private place and outside of the public view when they record such persons in connection with their duties as police officers. Pursuant to OCGA §16-11-62 (2) (D):

> [I]t shall not be unlawful . . . [f]or a law enforcement officer or his

does *not* lose one's reasonable expectation of privacy simply when he or she invites a family member or someone who is more akin to being a member of the household into a place where one has a reasonable expectation of privacy. See Kelley v. State, 233 Ga. App. 244 (2) (503 SE2d 881) (1998) (Sixteen-year-old girl had a reasonable expectation of privacy against her own family members when she was passed out nude in the family's home bathroom in the act of or following bathing). See also OCGA § 16-1-3 (15) (defining "public place" as used in Title 16 as "any place where the conduct involved may reasonably be expected to be viewed by people *other than members of the actor's family or household*") (emphasis supplied).

Here, the indictment as written does not establish that Brindle was not a member of or akin to being a member of Rogers' household; it indicates that Brindle was not a stranger or casual guest to Rogers or the residence in Fulton County where the alleged video recording took place. In fact, the indictment

---

or her agent to use a device in the lawful performance of his or her official duties to observe, photograph, videotape, or record the activities of persons that occur in the presence of such officer or his or her agent.

27

emphasized that Brindle's attorneys allegedly had "[n]umerous audio and video recordings" of sexual encounters between Brindle and Rogers;[14] that Brindle was expected to have the ability to make a "covert video recording of [Rogers] inside his residence;" that there were "videos of other sexual encounters between [Rogers] and [Brindle];" that Brindle was able to make "audio and video recordings of some of the [sexual] incidents . . . which occurred in Fulton County and at Sea Island in Glynn County, Georgia;" that there may have been "another covert videotape of [Rogers] and [Brindle] engaged in a sexual encounter. . . [where Rogers] was '[p]artially naked;'" and that Brindle had another "embarrassing . . . video recording of a sexual encounter involving [Rogers] and [Brindle] at [Rogers'] Sea Island residence." These allegations do not point to the activities of someone who was a stranger to Rogers or the residential address at which the surreptitious video recording is alleged to have occurred. To the contrary, the indictment shows that Brindle and Rogers were

---

[14] We note that, although the indictment alleges that Brindle's attorneys *characterized* the relationship between Rogers and Brindle as non-consensual, the indictment does not state that this characterization was true or that the actual sexual relationship between Rogers and Brindle was not consensual. If the indictment showed that the sexual relationship in this case was not consensual, our analysis might be different.

involved to a point where Brindle may have been the type of household member who could be allowed into Rogers' residence without Rogers or the other members of the household losing their reasonable expectation of privacy in those areas of the home that they intended to remain private. See Moses v. State, 328 Ga. App. 625, 628 (2) (a) (760 SE2d 217) (2014) (homeowner did not lose reasonable expectation of privacy "by allowing persons such as household residents, family members of residents, or housecleaners access to the house").[15] Accordingly, even when we use the Fourth Amendment as a guide, the indictment here sufficiently alleges that the video recording took place in a "private place." The fact that the indictment also indicates that these areas were outside of public view is sufficient to satisfy the requirements of OCGA § 16-11-62 (2). Because the indictment here alleged facts showing that the defendants could be found guilty of the crimes charged in Counts 2-4 based on a conspiracy to violate, and the actual violation of, OCGA § 16-11-62 (2), the trial court erred in holding otherwise.

---

[15] We need not address the Appellees' argument that Rogers no longer had a reasonable expectation of privacy because he was carrying on an adulterous relationship with Brindle, because there is no allegation *in the indictment* that the relationship between Rogers and Brindle was adulterous.

3. The trial court also erred in concluding that OCGA §§ 16-11-62 (2) and 16-11-66 (a) are unconstitutionally vague. "A statute is unconstitutionally vague if it fails to give a person of ordinary intelligence notice of the conduct which is prohibited and encourages arbitrary and discriminatory enforcement. [Cit.]" Johnson v. State, 264 Ga. 590, 591 (1) (449 SE2d 94) (1994). As explained more fully in Division 2 (a), supra, there is nothing unclear about the requirement in OCGA § 16-11-62 (2) that "all" persons being observed must give their consent to be photographed or video recorded before such persons can be photographed or video recorded in a private place and out of public view. Nor is it unclear that the one-party-consent rule of OCGA § 16-11-66 (a) does not apply to eliminate the requirement for "all" persons to give their consent to be legally photographed or video recorded in a private place and out of the public view consistent with the requirements of OCGA § 16-11-62 (2). People of ordinary intelligence can understand that they can be found guilty of illegal surveillance if they use a device to secretly photograph or video record others in private places and out of the public view without the consent of all persons being photographed or video recorded, and neither OCGA § 16-11-62 (2) nor OCGA § 16-11-66 (a) encourage arbitrary or discriminatory enforcement of

30

their respective provisions.

Judgment affirmed in part, reversed in part, and vacated in part. All the Justices concur, except Hunstein, Nahmias, Blackwell, Peterson, and Grant, JJ., who concur specially.

S17A1265.  THE STATE v. COHEN.

NAHMIAS, Justice, concurring in part and concurring specially in part.

I concur fully in Divisions 1, 2 (a), and 3 of the Court's opinion.  As for Division 2 (b), I agree with the Court's result but not all of its reasoning.  It should be emphasized as to the result that we are now reviewing a general demurrer to the indictment, which limits us to the allegations of the indictment and requires us to treat them as true.  With regard to the unlawful surveillance charges we allow to stand, the analysis might be different if we ever consider a full evidentiary record after trial.

Most significantly, I have serious doubts about looking even for guidance to modern "reasonable expectation of privacy" Fourth Amendment jurisprudence in interpreting the *pre-2015* statutory language defining a "private place" for purposes of OCGA § 16-11-62 (2) as "a place where one is entitled reasonably to expect to be safe from casual or hostile intrusion or surveillance." See former OCGA § 16-11-60 (3).  That language was approved by the General Assembly in April 1967, see Ga. L. 1967, pp. 844, 852, and appears to be based on similar language in § 250.12 (1) of the 1962 Model Penal Code.  It clearly

did not refer to the revolution in Fourth Amendment jurisprudence that occurred only later that year, when in December the United States Supreme Court ushered in a new standard for determining the reach of the constitutional privacy protection and first used the term "reasonable expectation of privacy" in Katz v. United States, 389 U.S. 347, 360 (88 SCt 507, 19 LE2d 576) (1967) (Harlan, J., concurring).  See United States v. Jones, 565 U.S. 400, 405-406 (132 SCt 945, 181 LE2d 911) (2012) (discussing the "deviation" from the traditional property-based approach to Fourth Amendment jurisprudence aligned with common-law trespass doctrine that was effectuated by Katz's "reasonable expectation of privacy" approach).  See also Hudson v. State, 127 Ga. App. 452, 455 (193 SE2d 919) (1972) (Hall, P.J., dissenting) (using the phrase "reasonable expectation of privacy" for the first time in a Georgia appellate decision).

Nevertheless, without acknowledging the real roots of former § 16-11-60 (3), this Court and the Court of Appeals have looked to modern Fourth Amendment case law to determine the scope of the protection against surveillance devices provided by OCGA § 16-11-62 (2), as the Court's opinion explains.  We need not decide today if doing so is really appropriate, because the end result in this case, at least on general demurrer, is the same.  And this

Court may never need to resolve the issue, because in 2015 the General Assembly redefined "private place" in OCGA § 16-11-60 (3) as "a place where there is a reasonable expectation of privacy," thereby abandoning the Model Penal Code formulation and squarely invoking the modern Fourth Amendment test. See Ga. L. 2015, p. 1046, § 1.

I do not agree with everything said in the text and footnotes of Division 2 (b), but it reaches the right result, so I concur specially in that portion of the Court's opinion.

S17A1265. THE STATE v. COHEN.

BLACKWELL, Justice, concurring specially.

I do not agree with all that is said in the opinion for the Court, and so, I do not join it. I do agree, however, that the indictment is not sufficient to survive a general demurrer with respect to conspiracy to commit extortion because it does not allege that Mye Brindle and her lawyers conspired to *unlawfully* obtain property from Joe Rogers by means of a threat to disseminate embarrassing information. See OCGA § 16-8-16 (a) (3). Although the indictment alleges that Brindle and her lawyers demanded that Rogers settle certain claims and threatened to sue him if he did not, there is no allegation that the threatened lawsuit was baseless (much less that Brindle and her lawyers knew it to be baseless), nor is there any allegation that the settlement demanded had no reasonable connection with the threatened lawsuit.[1] A proper application of the

---

[1] A simple hypothetical illustrates my understanding of the extortion statute. Like threats to disseminate embarrassing information, threats to accuse someone of a crime may, if used to obtain property from another, amount to extortion. See OCGA § 16-8-16 (a) (2). If I obtain property from you by threatening to call law enforcement and accuse you of a crime, it might be extortion, but not necessarily. If the property that I obtain is mine, I only threaten to accuse you of having stolen it, and the accusation is not baseless, there is nothing *unlawful* about my obtaining the property in question by means of the particular threat employed. On the other hand, if I obtain property from you to which I have no claim of right by threatening to accuse you of a crime (irrespective of whether the accusation is baseless) — "Unless you pay me $10,000, I will tell the police (truthfully) that you're a drug dealer" — it might be extortion. Likewise, if I obtain property from you (whether or not I have

extortion statute is enough to resolve this case, and we need not address the First Amendment.

As for the unlawful surveillance counts, I agree that they survive a general demurrer. Irrespective of whether Rogers had a reasonable expectation of privacy under the Fourth Amendment in the place in which he was subjected to video recording, it appears from the facts alleged in the indictment that he had a reasonable expectation that he would not be subjected to casual or hostile photographic or video surveillance in that place. The State has adequately alleged that Rogers was in a private place under former OCGA § 16-11-60 and OCGA § 16-11-62 (2).

I am authorized to state that Justices Hunstein and Peterson join this special concurrence.

---

a claim of right to it) by means of a threat to falsely accuse you of a crime, knowing the accusation to be baseless — "Pay me back the money that you owe me, or I will tell the police (falsely) that you are a drug dealer" — it might be extortion.

S17A1265.  THE STATE v. COHEN.

GRANT, Justice, concurring specially in part.

While I do not agree with all that is said in the Division 2 (b) of the Court's opinion (and thus cannot join it), I do agree in full with the following statement: "[T]here is nothing in the former version of OCGA § 16-11-62 (2) to show that the reasonable expectation to be safe from 'hostile intrusion or surveillance' under the statute is coextensive with one's 'reasonable expectation of privacy' under the Fourth Amendment to the United States Constitution." Slip op. at 24.

It is also true that we and the Court of Appeals have looked to the Fourth Amendment as a guide in interpreting the statute, but we have done so in remarkably different circumstances than the ones before us today.  In both *Burgeson v. State*, 267 Ga. 102 (475 SE2d 580) (1996) and *Quintrell v. State*, 231 Ga. App. 268 (499 SE2d 117) (1998), *government agents* were alleged to have illegally surveilled criminal defendants.  In that context, it is no surprise at all to look toward the Fourth Amendment, which serves as a constitutional boundary to the behavior of the government.  But here, in analyzing the actions

taken by private parties, the Fourth Amendment provides something less than a useful guide; in fact, applying Fourth Amendment rules may even serve to confuse rather than clarify the meaning of the statute.[1]

To begin, much of what the majority applies as seminal Fourth Amendment law had not yet been announced by the United States Supreme Court at the time that OCGA § 16-11-62 was drafted. See Ga. l. 1967, pp.844, 852. The "private place" definition at issue here was passed by the General Assembly in April of 1967, while the United States Supreme Court did not issue its *Katz* decision until December of that same year. See *Katz v. United States*, 389 U.S. 347 (88 SCt 507, 19 LE2d 576) (1967). And the *Smith v. Maryland* decision that the majority quotes and applies was not issued until more than a decade later. See 442 U.S. 735 (99 SCt 2577, 61 LE2d 220) (1979) ("In determining whether a particular form of *government-initiated* electronic surveillance is a 'search' within the meaning of the Fourth Amendment, our

---

[1] Apart from the Fourth Amendment issues outlined more fully in this special concurrence, and in contrast to the majority opinion, I also note that the statutory text provides no reason that the recording of consensual and nonconsensual conduct would be treated differently under the statute. See Slip op. at 28 n.14. Additionally, one would expect that the indictment would include an allegation that the sexual activities at issue were consensual if that were an important factor in the interpretation of the statute–particularly where, as here, it was commonly understood that the activities were alleged by Ms. Brindle to be nonconsensual.

2

lodestar is *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507 (1967)." (emphasis added)). Relying on these cases leads to the odd conclusion that perhaps if Ms. Brindle had been a stranger rather than a guest, her surveillance would have been lawful. Slip op. at 28-29. Or, perhaps, that Mr. Rogers would have had a lessened expectation of privacy for the same activities in Ms. Brindle's home rather than in his own. Id.

The statute cannot bear the weight that the Fourth Amendment puts on it when addressing the behavior of private parties and not of the government. In fact, the one Georgia case cited to support the potential distinction between privacy from strangers and privacy from family members or other close parties, is one that specifically concluded that "there is almost a total lack of authority" addressing parental wiretapping, which was the closest Fourth Amendment analog that the court could identify. *Kelley v. State*, 233 Ga. App. 244, 248-249 (503 SE2d 881) (1998). The court instead looked to an earlier Georgia case interpreting OCGA § 16-11-62 without any reference at all to the Fourth Amendment. Id. (citing *Ransom v. Ransom*, 253 Ga. 656 (324 SE2d 437) (1985)).

Nor am I as certain as my colleague that when the General Assembly redefined "private place" to constitute "a place where there is a reasonable expectation of privacy," the legislature was "squarely invoking the modern Fourth Amendment test." Slip op. at __, (Nahmias, J. concurring in part and concurring specially in part). Perhaps Fourth Amendment tests are more relevant under the new version of the statute–or perhaps not. After all, the amended statute still addresses a privacy interest quite different than the one that we all share against government search and seizure. But we need not make that determination until the proper case is before us, and I would decline to do so here.

I am authorized to state that Justice Hunstein and Justice Blackwell join in this concurrence.