**THIRD DIVISION**
**DOYLE, P. J.,**
**MARKLE and PADGETT, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**March 16, 2026**

# In the Court of Appeals of Georgia

A25A1647. KIDD v. PORTER.

DOYLE, Presiding Judge.

Earl Porter III filed the instant lawsuit alleging defamation/libel after receiving emails from Joseph Kidd related to a charitable endeavor started by Porter, to which Kidd had donated. Kidd moved to strike Porter's complaint under Georgia's anti-Strategic Lawsuits Against Public Participation ("anti-SLAPP") statute, OCGA § 9-11-11.1, and/or to dismiss pursuant to OCGA § 9-11-12(b)(6). The trial court denied the motion, and Kidd appeals, arguing that the trial court erred. For the reasons that follow, we reverse the order and remand for further proceedings consistent with this opinion.

> A 'SLAPP,' or 'Strategic Lawsuit Against Public Participation,'
> is a meritless lawsuit brought not to vindicate legally cognizable rights,

but instead to deter or punish the exercise of constitutional rights of petition and free speech by tying up its target's resources and driving up the costs of litigation. Georgia's anti-SLAPP statute, OCGA § 9-11-11.1, allows a defendant to move to strike or dismiss such a frivolous action as an avenue for ending the suit quickly, summarily, and at minimal expense. Further, we construe the statute broadly in furtherance of the General Assembly's declared purpose to encourage participation by the citizens of Georgia in matters of public significance and public interest through the exercise of their constitutional rights of petition and freedom of speech. This Court reviews a trial court's ruling on an anti-SLAPP motion to strike de novo, viewing the pleadings and affidavits submitted by the parties in the light most favorable to the plaintiff (as the non-moving party).

*Giraldi v. Bowen*, 374 Ga. App. 347, 347–48 (912 SE2d 724) (2025) (citations and punctuation omitted).

So viewed, Porter and Kidd met in law school and formed a friendship before graduating and eventually working at the same law firm. Porter left the firm, and in June 2021, he reached out to the then-chair of Toughest Kids Inc. ("TKI"), a 501(c)(3) charitable organization, about developing a charitable project through TKI to assist children of military personnel lost to suicide. The two developed the idea for Project Something Outta Nothing ("Project SON"), the purported goal of which was

to raise money for the families of these lost service members through funding a specific trust.

Kidd donated $6,000 to Project SON, which funds he believed would be used to support struggling service members or their families based on his understanding of the project at that time. At some point between making the donation and August 2024, Kidd became suspicious as to the use of the money, and he contacted Porter, the current president of TKI, and two individuals connected to Project SON, Jason Pomeroy, and Kiyong Song, to demand information about his suspicions. In the emails to Porter and Song, Kidd threatened to file a lawsuit for any potential claims he may have. Kidd also stated that he understood the statute of limitation for any possible claims regarding the donation would run as of September 10, 2024. A timeline of their communications follows.

*August 26, 2024*

Kidd text-messaged and emailed Porter, "I need information on how much was raised during the S. O. N. project and where the money went. Please text/email me, no phone calls." Porter responded that he did not have that information, but he had reached out to TKI about it. A longer email from Kidd followed:

3

Pardon the formality, but just to be safe: none of my communications to you or TKI constitute legal advice. The only legal advice I have for you is to secure your own legal counsel. While we wait on TKI, the records I've already pulled show that:

You raised ~$50,000 for charity, primarily veteran suicide awareness and White Star Families,

You changed the donation website to have it say that donations go to a -$30,000 Ford F150 (aka Queen of Battle),with leftovers going to White Star Families/other beneficiaries;

To date you have not publicly disclosed the total donations, donors, or any monetary beneficiaries.

If there is even some truth to the above, I have an action for fraud and several other claims (which I may pursue on my own behalf or on behalf of all defrauded donors). Again, not legal advice, but you may have disclosure requirements under the Georgia Charitable Solicitations Act as a charitable solicitor. If so, you may be required to keep records at least 3 years and provide them upon request. Please consider today's communications my formal request for all records you have on donations and spending related to Project S.O.N.

That same day, Kidd emailed Porter a page of a complaint, labeled "charity scam complaint," and stated that he would file the complaint on September 10 if Porter failed to make reasonable attempts to settle.

*August 27, 2024*

Kidd emailed Porter, stating that

> I know yesterday's developments may have been unsettling, but we need to keep the ball rolling on this. If we do not reach a settlement agreement soon, I plan to take the following steps on or before September 10: File a complaint in federal court for, at minimum, Fraud, Civil RICO, violations of the Charitable Solicitations Act, and Unjust Enrichment; Send a copy of the complaint to the State Bar of Georgia, due to the issues raised with respect to attorney ethics;

> Send a copy of the complaint to the United States Attorney's Office for the NDGA, due to the federal law criminal issues raised; Send a copy of the complaint to the Fulton County District Attorney's Office due to the state law criminal issues raised, and Begin preparing for Class Action certification by contacting all potential donors and those with involvement in Project S.O.N.

> Georgia actions sounding in Fraud allow for recovery of compensatory as well as punitive damages, in addition to attorney's fees. As the Complaint will further detail I seek to recover:

Compensatory damages of $6,000.00. As you know. I donated $6,000.00 to Project S.O.N. in hopes that it would be used to combat veteran suicide and benefit White Star Families. I would not have made this donation if I believed it would predominantly be spent on a truck or otherwise squandered. ...

If you need more time (past September 10) to put together a reasonable settlement offer and/or funds, then I need to know ASAP. We can structure a tolling agreement whereby you agree to waive all defenses with respect to the statute of limitations until a date certain.

Please be mindful of my records request as well. I claim the right to use any undue delay—or attempt to hide, conceal or destroy records—as well as any statement with respect to the non-existence of records, as evidence in this lawsuit.

Later that same day, Kidd emailed Porter:

I can imagine no credible, good-faith explanation for your failure to respond with any information or records regarding Project S.O.N. donations and expenditures. As the spearhead of this Project, you should have been able to immediately respond with at the very least an estimate of total monies raised and major expenditures. Your silence raises concerns in addition to those alleged in the Complaint.

If you do not begin disclosure of records and information by midnight, August 27, I will promptly begin third-party inquiries starting with the

below list of [at least 10] individuals/addresses. Should you make an attempt to coordinate in bad faith with persons on this list or otherwise affiliated with Project S.O.N., I reserve the right to incorporate additional claims in the Complaint, including but not limited to civil conspiracy.

*August 28, 2024*

Jason Pomeroy fowarded to Porter the following email, which Pomeroy (who had volunteered with Project SON) had received from Kidd:

> I hope all is well. I have some unfortunate news and am hoping you will assist in whatever way possible. After doing some extensive digging, it appears that Earl/Chico Porter raised over $50,000 for charity, and none was given to the intended beneficiaries or White Star families. He claims to have no records or information himself and has since stopped responding to inquiries. The only transaction I can find from public records is a $30,000 Ford (I believe Queen of Battle) that he appears to have kept for his own personal use. It also appears that after raising ~$50,000, he changed the donation website to have it say that the acquisition of this truck would take priority over any other beneficiaries.
>
> When you have time, please let me know if you have any information on the following topics: Monies raised (including your own contributions and dates); Significant purchases; Donors giving more than 3100; Transaction details surrounding Queen of Battle/a Ford F150, SVT Raptor Extended Cab, VIN # 1 FTEX1EV4AFB03044; and Sources or

any individuals that would have more extensive knowledge about finances, donations, and spending.

Toughest Kids Inc. is cooperating, but they have not provided any information to make the situation look better.

*August 29, 2024*

Kidd emailed Porter:

Multiple attempts to resolve this apparent charity fraud issue with you. To date, the below circumstance [sic] justify deep concern and suspicion:

1. From 2021-2022, you raised approximately $50,000.00 for charity-specifically for beneficiaries including White Star Families (individuals who had lost family members to veteran suicide).

2. After raising tens of thousands of dollars, to this day, you have not publicly disclosed My donations made to White Star Families or other beneficiaries.

3. The only transaction of public record I can find connected to your charity campaign is the acquisition of a $30,000 truck.

4. I asked for an explanation for these concerning facts on Monday, August 26, 2024. You have made no effort to provide any explanation or accounting for the funds raised and how they were used.

I still hope that there is an honest explanation that would allay my concerns regarding the misuse of charity funds and their apparent fraudulent acquisition; however that hope is all but gone.

In the coming days, I will compile records evincing the above circumstances and file a formal grievance with the State Bar of Georgia. Before doing so, I am asking once more that you make a good-faith effort to resolve this dispute amicably.

*September 4-6, 2024*

On September 4, Kidd communicated with Porter's attorney, and he stated that his primary concerns were alleviated, but still wanted to know "what happened to the ~$50,000 raised." Kidd spoke with TKI's president, on the phone and over email, and he explained that Porter had raised about $52,000 for Project SON; the president forwarded a very general accounting of the project, showing approximately $42,000 in donations and $41,000 in expenses, including roughly: $2,000 for meals, $20,000 for "operational expenses," $8,500 for "supplies and materials," $8,500 for travel and lodging, and $2,000 for vehicle fuel and repairs. On September 6, in response to

a follow-up by Kidd, the president clarified that he had probably been mistaken when he initially told Kidd the total. He admitted that he had no firsthand knowledge because TKI was under different leadership at that time.

*September 8, 2024*

Kidd emailed Song (who also volunteered with Project SON) stating:

You are currently named as a co-conspirator in an action to-be-filed on Tuesday, September 10. The claims involve charity fraud, theft, conversion, and fraudulent acquisition of approximately $30,000.00 - $50000. These allegations implicate both civil and criminal penalties. Please alert me if/when you have obtained counsel. None of the correspondence contained within this email constitutes legal advice, the only legal advice I may offer is that you secure legal representation.

As you know, on August 28, 2024, I requested information from you related to Project S.O.N. You failed to respond. I am now reminding you of this request and providing notice that you may have statutory obligations under the Georgia Charitable Solicitations Act, other applicable law, and ethical codes of conduct. A reasonable person acting in good faith would have responded to such an inquiry, and an inference may be drawn from your protracted silence. It is my continued wish that this matter be resolved amicably. Because Mr. Porter is not currently cooperating with discovery or disclosure in good faith, and because Mr. Porter is apparently attempting to see this case barred by the statute of

limitations, I am forced to file this complaint on September 10 or risk waiver of certain claims.

In one final attempt at discovering the truth and seeking justice for the heinous acts detailed in the Complaint, I am demanding a response for your immediate attention on the following queries:

Are you aware of any salaries paid to Project S.O.N "volunteers" or affiliates? Are you aware of any monies paid toward Mr. Porter's speaking services, coaching, or his non-profit/for-profit business "Making Organized Noise, LLC"; How much money did you contribute to Project S.O.N? Are you aware of any significant purchases relating to Project S.O.N? Are you aware of any transaction or donation details surrounding Queen of Battle/ a Ford F150 Extended Cab driven by Mr. Porter? Are you aware of any sources or any individuals that would have more extensive knowledge about finances, donations, and spending? Do you have any pertinent information you wish to provide at this time?

If you provide a full response that appears to be made in good faith, I may drop you from this suit in order to avoid costs of service and other expenses. Any fraudulent statement delivered may serve to toll the applicable statute of limitations.

*September 9, 2024*

The parties executed a joint waiver of process that did not toll any applicable statute of limitation.

*Instant Litigation*

Kidd did not file suit on September 10, but two days later, Porter filed the instant lawsuit alleging: (1) libel per se, contending that Kidd's emails to Pomeroy and Song accused Porter of various crimes; (2) fraud for threatening to file a civil action unless Porter settled; (3) intentional infliction of emotional distress ("IIED") because the accusations about alleged misuse of charitable funds caused Porter great emotional distress; and (4) violations of the Georgia Influenced and Corrupt Organizations Act ("RICO Act") based on Kidd's threat of a civil lawsuit, which Porter alleged constituted extortion. Porter alleged that Kidd's acts had made him extremely distressed to the point of suicidal ideation, and because Kidd was aware of Porter's troubled upbringing, he should have been aware that the statements would have injured him.

In his complaint, Porter explained that although the larger plan of Project SON was to create the trust vehicle to support veterans and their families, in order to publicize the project, Porter completed a southbound through-hike of the Appalachian

Trail. Of the early donations to Project SON most went toward funding the hike, but the hope had been to raise enough to seed the trust. In support of the hike, TKI hired a project manager, Porter purchased hiking equipment, and TKI provided a trailer and truck. Porter contended that he did not handle or receive any money, and instead, the money was donated through TKI. Although some fund-raising around the project occurred, eventually the project was shelved when the then-chair of TKI died in a plane crash in July 2022. Attached to the complaint were various emails, heavily redacted personal bank statements that appeared to be from Porter's bank account, and a computer screen capture of old versions of the donation website.

Kidd answered and moved to strike the complaint under Georgia's anti-SLAPP statute, OCGA § 9-11-11.1, and/or to dismiss for failure to state a claim upon which relief could be granted, OCGA § 9-11-12(b)(6). Attached to his answer was an email exchange between him and TKI's president and brief summary of Project SON's amounts raised and spent. After a hearing, the trial court denied the motion, and Kidd now appeals.

Kidd argues that the trial court erred by denying his motion to strike because the emails were pre-litigation demand letters protected under OCGA § 9-11-11.1(c)(1), (c)(2), or (c)(4), and Porter cannot show that he is likely to win on his claims.

> In analyzing an anti-SLAPP motion to dismiss, the trial court engages in a two-step analysis. First, the trial court decides whether the moving party has made a threshold showing that the challenged claim is one arising from protected activity. The moving party meets this burden by demonstrating that the act underlying the challenged claim could reasonably be construed as fitting within one of the categories spelled out in OCGA § 9-11-11.1(c)(1)-(4).

*Giraldi*, 374 Ga. App. at 350-51(1) (citation and punctuation omitted). Those provisions include any written or oral statement

> (1) ... made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) ... made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; ... or (4) Any other conduct in furtherance of the exercise of the constitutional right of petition or free speech in connection with a public issue or an issue of public concern.

OCGA § 9-11-11.1(c).[1]

1. *Does the challenged claim arise from protected activity?* Kidd argues that under *Giraldi*, the communications at issue constituted pre-litigation demand letters, as evidenced by their content and the characterization given to them in Porter's complaint. See 374 Ga. App. at 356(1)(4)(d). Kidd contends that the implicit holding of *Giraldi* is that all pre-litigation activity is protected under OCGA § 9-11-11.1(c)(2). See 374 Ga. App. at 356(1)(4)(d) (citing *Kashian v. Harriman*, 98 CalApp4 892, 908(I) (2002). See also *Buckley v. DirectTV, Inc.*, 276 FSupp2d 1271, 1274 (ND Ga. 2003) (finding that cable provider's pre-litigation demand letters to purported purchasers of devices used to unscramble cable satellite signals without authorization were protected under Georgia's anti-SLAPP statute). See also *RCO Legal, P.S., Inc. v. Johnson*, 347 Ga. App. 661, 667–68(2)(b) (820 SE2d 491) (2018) (allegations of theft

---

[1] Alternatively, to the extent that Kidd raised the issue below of dismissal pursuant to OCGA § 9-11-12(b)(6), we agree that Porter has failed to state any claims for which relief can be granted for the reasons stated in Division 2(a)-(d). See *Rogers v. Dupree*, 349 Ga. App. 777, 783(2) (824 SE2d 823) (2019) (addressing one claim pursuant to a motion to dismiss and another based on anti-SLAPP). See, e.g., *Croxton v. MSC Holding, Inc.*, 227 Ga. App. 179, 180 (489 SE2d 77) (1997) ("A motion to dismiss may be granted only where a complaint shows with certainty that the plaintiff would not be entitled to relief under any state of facts that could be proven in support of his claim.").

could reasonably be construed as statements, writings, or petitions made before or in connection with an official proceeding). Even if *Giraldi* is not so broad, we agree that it applies in this case because all of Kidd's communications were centered around a purported lawsuit he planned to file by a date certain.

Porter, on the other hand, argues that *Giraldi* is at odds with our other caselaw, citing *Johnson*, which explained that not all pre-litigation activity is protected because "California has a specific statute that embodies a 'litigation privilege,' … and Georgia does not." 347 Ga. App. at 671(2)(c)(ii). But this section of *Johnson* relates to the second issue in the two-part assessment — the portion of the test during which we assess each of the plaintiff's claims. Thus, we decline to impose that rule for the first issue — whether the claim arose from a protected activity. Porter also cites to *Emory Univ. v. Metro Atlanta Task Force for the Homeless*, which upheld the denial of an anti-SLAPP motion because there was no evidence of an official proceeding. 320 Ga. App. 442, (740 SE2d 219) (2013). That case is from 2006, and the Supreme Court of Georgia has explained that "the 2016 amendment [to the statute] fundamentally altered the mechanics of the anti-SLAPP procedure. Thus, our precedents construing the pre-amendment version of OCGA § 9-11-11.1 are of limited utility in interpreting

the revised anti-SLAPP statute." See *Wilkes & MCHugh, P.A. v. LTC Consulting, LP*, 306 Ga. 252, 257(2) (830 SE2d 119) (2019).[2] Thus, we apply *Gilardi* and hold that Kidd's letters arose from protected activity. Accordingly, the trial court erred by concluding otherwise, and we move to the second part of the test.

2. *Has Porter shown a reasonable probability of prevailing on the merits?* "If the moving party makes a threshold showing of protected activity, then the court proceeds to the second step of the analysis and determines *whether the plaintiff has established* a reasonable probability that he will prevail on the merits of his claim." *Giraldi*, 374 Ga. App. at 351(1) (citation and punctuation omitted; emphasis added). To make such a showing, "the plaintiff must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." *Am. Civil Liberties Union, Inc. v. Zeh*, 312 Ga. 647, 653 (864 SE2d 422) (2021) (citation and punctuation

---

[2] *Wilkes* explains that in determining the first question, "[i]t is not enough to show that the claim was filed after protected activity took place or arguably may have been triggered by protected activity. The critical consideration is whether the cause of action is based on the defendant's protected free speech or petitioning activity. A defendant meets its burden by demonstrating that the act underlying the challenged claim could reasonably be construed as fitting within one of the categories spelled out in subsection (c)." 306 Ga. at 261-62(2)(b) (citation and punctuation omitted).

omitted). "A claim that satisfies both prongs of the anti-SLAPP statute is subject to being stricken."*Giraldi*, 374 Ga. App. at 351(1).

(a) *Libel per se.* Libel is a type of defamatory statement and is therefore considered under the same umbrella as defamation. *Boley v. A-1 Horton's Moving Serv. Inc.*, 373 Ga. App. 574, 578(2) n.4 (907 SE2d 372) (2024). A claim for defamation has four elements: "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm." *Zeh*, 312 Ga. at 650(1)(b). Libel per se is supported by statements "[i]mputing to another a crime punishable by law" or "making charges against another in reference to his trade, office, or profession, calculated to injure him therein," and no special damages are required. *Cottrell v. Smith*, 299 Ga. 517, 524(II)(A) (788 SE2d 772) (2016). See OCGA § 51-5-4(a)(1), (a)(3). Because the vast majority of the communications referenced by Porter are emails between the parties, those communications cannot constitute libel as a matter of law.

Moreover, a plaintiff cannot recover for libel if he admits the truth of the statements attributed to the defendant. See *Carey v. Glen Restaurants*, 166 Ga. App.

18

638 (305 SE2d 171) (1983). See also OCGA § 51-5-6 ("The truth of the charge made may always be proved in justification of an alleged libel or slander."). "In determining whether a statement is false, defamation law overlooks minor inaccuracies and concentrates upon substantial truth. A statement is not considered false unless it would have a different effect on the mind of the viewer from that which the pleaded truth would have produced." *Jaillett v. Ga. Television Co.*, 238 Ga. App. 885, 888 (520 SE2d 721) (1999). Moreover, although

> there is no wholesale defamation exemption for anything that might be labeled "opinion[,]" ... [t]he requirement that, to be actionable, a statement of opinion must imply an assertion of objective facts about the plaintiff unquestionably excludes from defamation liability not only statements of rhetorical hyperbole[,] but also statements clearly recognizable as pure opinion because their factual premises are revealed. Both types of assertions have an identical impact on readers — neither reasonably appearing factual — and hence are protected equally.

Id. at 890 (punctuation omitted). "If an opinion is based upon facts already disclosed in the communication, the expression of the opinion implies nothing other than the speaker's subjective interpretation of the facts[,]" and is therefore not actionable. Id. See also *Collins v. Cox Enters., Inc.*, 215 Ga. App. 679, 680 (452 SE2d 226) (1994)

19

(speculative statements that cannot be proven as absolutely true or false are "the sort of opinion that is not actionable as libel"). We turn to the two communications from which Porter could allege a claim of libel or libel per se.

(i) *August 28 Pomeroy Letter*. Pretermitting whether this is a privileged communication,[3] when read in full, it is not actionable libel. The statement that Porter raised money which did not go to support any beneficiaries and families was admitted by Porter. It also does not claim that Porter was the reason for this issue. Porter also told Kidd that he did not have records. The email refers to no crime, but it provides a list of information that Kidd states "appears" to be true based on information he has gathered so far, namely that Porter retained use of a truck purchased or used for Project SON, and that it "appeared" that after donations were provided, he changed

---

[3] "[C]ommunications which are afforded an absolute privilege cannot form the basis of a defamation action, regardless of the falsity of the statements or the speaker's malicious intent; conditionally privileged statements, on the other hand, are actionable upon a showing of malice." *Renton v. Watson*, 319 Ga. App. 896, 900 (2) (739 SE2d 19) (2013) (citations and punctuation omitted). To establish that the defamatory statement was conditionally privileged, Kidd would have to "show that (a) [he] acted in good faith; (b) in connection with an interest to be upheld; (c) the statement was properly limited in its scope and occasion; and (d) publication was made to proper persons." *Smith v. DiFrancesco*, 341 Ga. App. 786, 789–91(2) (802 SE2d 69) (2017) (explaining that a determination of conditional privilege is normally a question for a jury).

the website to say that acquisition of the truck would take priority over other beneficiaries. Statements like the ones in this letter, "that reflect an opinion or subjective assessment as to which reasonable minds could differ, cannot be proved false." *Gettner v. Fitzgerald*, 297 Ga. App. 258, 261 (677 SE2d 149) (2009) (cleaned up). Although the statement about changing the website, the information it contained, and who changed it, could be proven true or false, the email is vague and contains a caveat as to Kidd's current understanding along with a request for more information in the email. Moreover, the letter goes on to request assistance with contacts or information that could clarify Kidd's current understanding of how donation money was spent, among other things. Taken as a whole, although this letter shows that Kidd does not think well of Porter, it does not meet the threshold to constitute libel, especially libel per se. See, e.g., *Gast v. Brittain*, 277 Ga. 340, 341 (589 SE2d 63) (2003) ("An opinion can constitute actionable defamation if the opinion can reasonably be interpreted, according to the context of the entire writing in which the opinion appears, to state or imply defamatory facts about the plaintiff that are capable of being proved false."). This letter does not support a claim of libel per se, and thus, the trial court erred by determining otherwise.

(ii) *September 8 Song email.* Again, pretermitting issues of privilege, this email is not actionable libel. It clearly states that Kidd would named Song in a lawsuit to be filed, alleging certain claims against him that "involve charity fraud, theft, conversion, and fraud," of about $30,000 to $50,000. In relation to extortion claims, the Georgia Supreme Court has held that "[a] demand letter that merely threatens a lawsuit in connection with that potential litigation could not serve as a proper basis for a charge of extortion, as a party's right to pursue such litigation is protected by the First Amendment." *State v. Cohen*, 302 Ga. 616, 623–24(1), n.9 (807 SE2d 861) (2017). In any event, none of the statements made to or about Song would be actionable by Porter. The remainder of the letter requests information about the donations and spending within "Project SON" and demands that Song provide that information. *Jaillett*, 238 Ga. App. at 888. The email implies that Porter is named in the lawsuit as well, but it does not state that Porter is guilty, and obviously, the allegations are civil in nature. Compare *Cottrell*, 299 Ga. at 524(II)(A).

The clearest statements included in the email about Porter are matters of Kidd's opinion of Porter's behavior regarding discovery and the statute of limitations. The other mention of Porter's name appears in a list of questions that are requests for

information regarding different financial aspects related to Project SON, and they do not imply a conclusion as to anyone. And while it is true that Kidd had received some limited information from TKI about Project SON spending prior to emailing Song, that accounting was vague and listed over $20,000 in expenses nebulously labeled "operational support." Moreover, the president's initial tally of $52,000 was inconsistent with the spending document, resulting in a possible missing $10,000, and the president did not have firsthand knowledge of the project, as he told Kidd.

Accordingly, based on the foregoing, we conclude that the trial court erred in its application of the anti-SLAPP statute, OCGA § 9-11-11.1, as to Kidd's libel per se claims.

(b) *Fraud*. Fraud has five elements: (1) a false representation by defendant, (2) scienter, (3) intention to induce the plaintiff to act or refrain from acting, (4) justifiable reliance by plaintiff, and (5) damage to plaintiff. See *Coe v. Proskauer Rose, LLP*, 314 Ga. 519, 526-27(2) (878 SE2d 235) (2022). Porter alleges that Kidd committed fraud by threatening to file a lawsuit or report him to a professional body in order to "induce" Porter to give Kidd information about the charitable donations from TKI that he argues he could not give or settle before Kidd filed the lawsuit. Porter also

alleges that the false representation of a threatened lawsuit caused him injury in the form of hiring an attorney or in emotional distress. This simply is not fraud.

First, we have uncovered no case upholding a claim for attempted fraud in the civil arena. Additionally, Porter admitted that he did not believe Kidd's statements to him. Thus, he was not justified in acting on Kidd's statements. Moreover, if the statements were incorrect, he was not deceived and could not have shown damage flowing from the alleged fraud. See, e.g., *Dennis v. First Nat'l Bank of the S.*, 293 Ga. App. 890, 895(2)(a) (668 SE2d 479) (2008) (there can be "no justifiable reliance on a promise which is unenforceable at the time it is made") (citation and punctuation omitted); *Sheffield v. Darby*, 244 Ga. App. 437, 439(2) (535 SE2d 776) (2000) ("A party may not *justifiably* rely on and assume to be true representations consisting of mere expressions of opinion, hope, expectation, puffing, and the like; rather, the party must inquire into and examine such representations to ascertain the truth.") (emphasis added); *Brown v. Mack Trucks, Inc.*, 111 Ga. App. 164, 167 (141 SE2d 208) (1965) (explaining that if "the representation consists of general commendations or mere expressions of opinion, hope, expectation and the like . . . the party to whom it is made is not justified in relying upon it and assuming it to be true[.]").

24

Accordingly, based on the foregoing, we conclude that the trial court erred in its application of the anti-SLAPP statute, OCGA § 9-11-11.1, as to Kidd's fraud claim.

(c) *Intentional infliction of emotional distress.*

It is well settled that to recover on a claim of [IIED], a plaintiff must show evidence that: (1) defendants' conduct was intentional or reckless; (2) defendants' conduct was extreme and outrageous; (3) a causal connection existed between the wrongful conduct and the emotional distress; and (4) the emotional harm was severe. The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The distress must be reasonable and justified under the circumstances, and there is no liability where the plaintiff has suffered exaggerated and unreasonable emotional distress.

*Ghodrati v. Stearnes*, 314 Ga. App. 321, 323 (723 SE2d 721) (2012) (footnotes and punctuation omitted).

Porter argues that Kidd was aware of his troubled upbringing and knew that accusing him of such acts would be especially hurtful. He claims extreme emotional distress as a result. Nevertheless, he could not show IIED in this circumstance because it is such a high bar.

For instance, in *Ghodrati*, this Court found that racist and derogatory insults were not sufficient to state a claim for IIED. See id. Compare with *Howerton v. Harbin*

*Clinic, LLC*, 333 Ga. App. 191, 206-07(2)(a) (776 SE2d 288) (2015) (stating a claim for IIED after doctor exposed his pubic hair to her and discussed her pubic area with other staff during plaintiff's gynecological procedure) (physical precedent only). And had Kidd actually filed the threatened lawsuit, Porter would not have been able to state a claim of IIED in response. See *Nairon v. Land*, 242 Ga. App. 259, 261(2) (529 SE2d 390) (2000) (IIED claim for filing a lawsuit is barred by statute). Simply put, the communications at issue are not sufficiently outrageous to constitute IIED.

Accordingly, based on the foregoing, we conclude that the trial court erred in its application of the anti-SLAPP statute, OCGA § 9-11-11.1, as to Kidd's IIED claim.

(d) *Civil RICO - Extortion*. Porter alleged that Kidd violated the Georgia RICO Act, OCGA § 16-14-1 et seq., by attempting to extort him with the demand letters demanding settlement to avoid a lawsuit. "A racketeering activity also known as a predicate act, is the commission of, the attempt to commit, or the solicitation or coercing of another to commit, a crime which is chargeable by indictment under one of forty-one categories of offenses. OCGA § 16-14-3(9)(A)(i)–(xli)." *Cambre & Assocs., LLC v. Lazenby*, 377 Ga. App. 652, 657(2) (922 SE2d 855) (2025) (punctuation omitted). "Racketeering activity" is defined at OCGA § 16-14-3(5), with

a long list of predicate acts and cross-references to other statutes, and extortion is on that list at OCGA § 16-14-3(5)(B). "And a 'pattern of racketeering activity' means that there have been at least two acts of racketeering activity that are interrelated and that were done 'in furtherance of one or more incidents, schemes, or transactions.' OCGA § 16-14-3(8)(A)." *Lazenby*, 377 Ga. App. at 657(2). In Georgia, however, threatening a lawsuit or sending pre-litigation demand letters is not actionable for a claim of theft by extortion or a claim of Civil RICO predicated thereon. See *Rolleston v. Huie*, 198 Ga. App. 49, 50–51(2) (400 SE2d 349) (1990) (threatening civil suit does not constitute theft by extortion nor does it state a tort claim) (overruled on other grounds by *Sewell v. Cancel*, 295 Ga. 235, 239 n.2 (759 SE2d 485) (2014) . See also *Cohen*, 302 Ga. at 624(1) n.9 ("a demand letter that merely threatens a lawsuit *could not serve as a proper basis for a charge of extortion*." (emphasis added) (citing *Buckley v. DirectTV, Inc.*, 276 FSupp2d 1271, 1275-1276 (ND Ga. 2003)). As a result, the demand letters cannot provide the basis for predicate acts under the RICO Act.[4] Accordingly,

---

[4] We also note that based on the holding in Division 2(c), supra, Porter failed to adequately plead how he justifiably relied on Kidd's alleged deception, and therefore, fraud does not provide a predicate act for a RICO claim. See, e.g., *Bazemore v. U. S. Bank Nat'l Ass'n*, 363 Ga. App. 723, 729-30(c) (872 SE2d 491) (2022).

based on the foregoing, we conclude that the trial court erred in its application of the anti-SLAPP statute, OCGA § 9-11-11.1, as to Kidd's civil RICO claim.

Based on the foregoing, the trial court erred by denying Kidd's motion to dismiss under OCGA § 9-11-11.1(c), and therefore, we reverse the order and remand for further proceedings consistent with this opinion.

*Judgment reversed and case remanded. Markle and Padgett, JJ., concur.*